**PARKLAND REPUBLICAN CLUB, Plaintiff,**

v.

**CITY OF PARKLAND, a municipal corporation, and Harry Mertz, in his official capacity as City Manager of the City of Parkland, Defendants.**

No. 01–7689–CIV.

United States District Court, S.D. Florida.

June 4, 2003.

Bruce S. Rogow, Beverly A. Pohl, Alvin Ernest Entin, Entin & Margules & Della Fera, Fort Lauderdale, FL, for Plaintiff.

Andrew S. Maurodis, Law Office of Andrew S. Maurodis Deerfield Beach, FL, for Defendants.

## ORDER DENYING PERMANENT INJUNCTION

ZLOCH, Chief Judge.

THIS MATTER is before the Court upon the Plaintiff, Parkland Republican Club's Emergency Motion For Preliminary Injunction (DE 3). The Court has carefully considered the Verified Complaint (DE 1), the aforementioned Motion, and other written submissions of the parties. An evidentiary hearing was held before this Court on November 2, 2001, and the Court is otherwise fully advised in the premises.

### I. *Background*

The Plaintiff, Parkland Republican Club (hereinafter "the Club"), commenced the above-styled cause by filing a Verified Complaint (DE 1) against the Defendants, City of Parkland and its City Manager Harry Mertz (hereinafter "the City"), seeking declaratory and injunctive relief pursuant to 42 U.S.C. § 1983. Specifically, the Club seeks to have declared unconstitutional a "policy" of the City that allows marching bands, youth, and civic organizations to participate in the Parkland Days Parade (hereinafter the "Parade"), but excludes political organizations from participating if they identify themselves as political organizations. The policy does not forbid a political organization from entering a float in the Parade as long as it does not identify itself as a political organization. The Parade is part of an annual event that traditionally occurs the first weekend in November and is sponsored and promoted by the City to celebrate its anniversary. The purpose of the Parade is to provide for fellowship and to allow the citizens of Parkland to get together in a fun, family-oriented, nonpolitical atmosphere. (DE 5, Resp. And Mem. Of Law In Opp'n To Pl's Req. For Prelim. Inj. at 5 (hereinafter "Defs.' Resp."); Hr'g Tr. at 7–8.)

In early September of 2001, the President of the Club, a nonprofit local political organization chartered by the Republican Party of Florida and by the Republican Party of Broward County, Florida, requested an application to participate in the November 4, 2001 Parade. The Parade Chairman advised the Club's President, Ms. Laura R. Seidman, that political clubs and commercial businesses were excluded from the Parade, although he acknowledged that exceptions were sometimes granted, and suggested Ms. Seidman check with City Hall. All subsequent requests for an application for the Club were denied by several City officials and employees including the Vice Mayor, the Assistant City Manager, and the City Manager. On each occasion the Club was informed that it was "city policy" to exclude political organizations from the Parade, although no ordinance, resolution, or other local law set forth the policy, which had apparently been enforced for at least thirty-seven years. On October 25, 2001, the Club submitted an official entry form for the Parade. On its entry form the Club noted that it would have a float in the Parade on which people would be waving American flags. The application did not state that the float would include a sign identifying the Club as the Parkland Republican Club, but Ms. Seidman testified that the float would bear such a sign. (Hr'g Tr. at 40.) On October 25, 2001, Harry Mertz, the City Manager, denied the Club's application to participate by simply noting "Denied" on its entry form. (DE 1, Pl.'s Verified Compl., Ex. B.) The Club alleges that this denial violates its rights to free expression guaranteed by the First and Fourteenth Amendments of the United States Constitution.

In the instant Motion (DE 3), the Club requests that the Court enter a preliminary injunction requiring the City to accept its application and to allow the Club to participate in the Parade.[1] At the evidentiary hearing, however, the parties stipulated that the evidence taken would serve for a permanent injunction and final judgment. (Hr'g Tr. at 61.) Therefore, the Court will consider the matter in light of the standards for a permanent injunction. Finally, the Court notes that it has jurisdiction over the above-styled cause pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

II. *Permanent Injunction Standard*

The Court notes that in order to obtain a permanent injunction the Club must show actual success on the merits. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). In addition, the Club must also prove (1) that it will suffer irreparable harm if the injunction is not granted; (2) that the threatened injury to the Club outweighs the harm the injunction may pose to the City; and (3) that granting the injunction will not adversely affect the public interest. *In re Daytona Beach Gen. Hosp.*, 153 B.R. 947, 950 (Bankr. M.D.Fla.1993).

A. *Actual Success on the Merits*

At the outset, the Court notes that determining whether the Club's First Amendment rights have been abridged requires a three-step analysis. *Cornelius v. NAACP Legal Def. and Educ. Fund*, 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). First, the Court must determine whether the Club's speech is protected under the First Amendment. *Id.* Second, the Court must determine what is the relevant forum because the nature of the

---

**1.** The Parade was originally scheduled for Sunday, November 4, 2001, but was postponed due to hurricane Michelle. The 2001 Parade was not rescheduled and the Parade was not held in 2002.

forum determines the extent to which the City may limit access to the forum. *Id.* And third, the Court must determine whether the justifications proffered by the City for limiting access to the forum comport with constitutional standards. *Id.*

### 1. *Type of Speech*

■ The Court notes again that the Club is free to participate in the Parade as long as it does not identify itself as a political organization. (Defs.' Resp. at 2, 5; Hr'g Tr. at 12.) The speech at issue, therefore, is the Club's ability to display some type of sign or banner identifying itself as a political organization while participating in the Parade. The Club asserts that such speech is political speech protected under the First Amendment.

There is no dispute that political speech is protected speech under the First Amendment. *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 69, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). It is clear that parades are a form of expression that have been afforded First Amendment rights. *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston,* 515 U.S. 557, 568–69, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995). In *Hurley,* the Supreme Court "use[d] the word 'parade' to indicate marchers who are making some collective point, not just to each other but to bystanders along the way." *Id.* at 568, 115 S.Ct. 2338. Adopting this understanding of the word "parade," and recognizing that the Supreme Court has held that the First Amendment protects such expressive activities as carrying placards and singing The Star Spangled Banner, *Edwards v. South Carolina,* 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963), refusing to salute the American flag, *West Va. State Bd. of Ed. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), wearing armbands to protest a war, *Tinker v. Des Moines Indep. Cmty School Dist.,* 393 U.S. 503, 505–506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), publicly burning the American flag, *Texas v. Johnson,* 491 U.S. 397, 399, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), and marching in a parade displaying a swastika, *Nat'l Socialist Party of America v. Skokie,* 432 U.S. 43, 44, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977), the Court concludes that the Club's participating in the Parade while displaying a sign that identifies itself as a political organization is political speech protected under the First Amendment.

### 2. *Type of Forum*

■ The Supreme Court has recognized three separate types of forums in which speech can take place: traditional public forums, limited public forums, and nonpublic forums. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Traditional public forums include "streets and parks which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Id.* at 45, 103 S.Ct. 948 (*quoting Hague v. C.I.O.,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)). In such a forum, the government may not enforce a content-based exclusion unless it is necessary to achieve a compelling state interest and narrowly drawn to achieve that interest. *Id.* (*citing Carey v. Brown,* 447 U.S. 455, 461, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980)).

■ Limited public forums are those public areas that the government "has opened for use by the public as a place for expressive activity." *Id.* at 45, 103 S.Ct. 948. These forums can be "created for a limited purpose such as use by certain groups ... or for the discussion of certain subjects ...." *Id.* at 45 n. 7, 103 S.Ct. 948 (*citing Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), and *City of Madison Joint School Dist. v. Wis.*

*Employment Relations Comm'n,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976)).

 The Court notes that the Supreme Court has not been consistent in stating what level of scrutiny is to be applied to limited public forums. In *Perry,* for example, the Supreme Court stated that while the government is not required to open such forums, "as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Id.* at 46, 103 S.Ct. 948 (*citing Widmar,* 454 U.S. at 269–70, 102 S.Ct. 269). More recently, however, the Supreme Court has held that "[t]he necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics." *Rosenberger v. Rector and Visitors of the Univ. of Va.,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (*citing Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439, and *Perry,* 460 U.S. at 49, 103 S.Ct. 948). To this end, when the government opens a limited public forum it must "respect the lawful boundaries it has itself set. *The State may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum' ... nor may it discriminate against speech on the basis of its viewpoint ....*" *Id.* (*quoting Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439) (citations omitted) (emphasis added). As a result, the Supreme Court has drawn "a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations." *Id.* at 829–30, 115

S.Ct. 2510 (*citing Perry,* 460 U.S. at 46, 103 S.Ct. 948).

 Finally, nonpublic forums are those public properties which are not by "tradition or designation a forum for public communication ...." *Perry,* 460 U.S. at 46, 103 S.Ct. 948. In these forums, "the 'First Amendment does not guarantee access to property simply because it is owned or controlled by the government.'" *Id.* (*quoting United States Postal Serv. v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 129, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981)). Rather, the government may impose time, place, and manner restrictions, as well as reserving "the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* (*quoting Greenburgh,* 453 U.S. at 131 n. 7, 101 S.Ct. 2676). The government's ability to restrict speech in this type of forum comes from the fact that "'[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is dedicated.'" *Id.* (citations omitted).

Having identified the various forums and their respective levels of judicial scrutiny, the Court must determine what is the relevant forum at issue here. In defining the relevant forum, the Supreme Court has stated that:

[F]orum analysis is not completed merely by identifying the government property at issue. Rather, in defining the forum we have focused on the access sought by the speaker. When speakers seek general access to public property, the forum encompasses that property.... In cases in which limited access is sought, our cases have taken a more tailored approach to ascertaining the pe-

rimeters of a forum within the confines of the government property.

*Cornelius,* 473 U.S. at 801, 105 S.Ct. 3439. Examples of this more "tailored approach" include *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), in which a political candidate sought to display a campaign advertisement on a city-owned bus and the Supreme Court defined the relevant forum as the advertising space on the bus, and *Perry,* where the Supreme Court defined the forum at issue as an interschool mail system and teacher mailboxes that a teacher group sought access to. *Perry,* 460 U.S. at 39, 103 S.Ct. 948.

■ In light of the Supreme Court's forum analysis, the Court finds that the forum at issue here is the Parade itself. The Court notes that the Parade is one event in "Parkland Days," which, as planned in 2001, was a two day festival that included a horse show, the dedication and opening of a children's activity center, a dance competition, a barbecue, and rides and amusement for children. (DE 1, Pl.'s Verified Compl., Ex. A at 2.) The Club is free to attend the Parade and festival at large, pass out literature, carry signs, and disseminate its message to other Parade and festival attendees. (Hr'g Tr. at 7.) In other words, there are "ample alternative channels of communication" open to the Club to exercise its First Amendment rights. *Perry,* 460 U.S. at 45, 103 S.Ct. 948. Likewise, the Club is free to hold its own parade at any other time of the year. (Hr'g Tr. at 11.) These facts make it clear to the Court that the Club is not restricted from speaking at the festival, nor is it denied access to the festival at large. Rather, the Club is restricted only from participating in the Parade while displaying a sign or banner that identifies itself as a political organization, and it is only to the Parade that the Club seeks access.

The Court further notes that the availability of "ample alternative channels of communication," such as attending the festival and disseminating its literature, establishes that the Club is not restricted from speaking in the traditional public forum of the streets of Parkland, and that the Parade itself is the forum at issue here.

Next, the Court must determine whether the Parade itself is a traditional public forum or a limited public forum. Limited public forums are usually created when the government opens a non-traditional forum for limited public discourse. *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. Here, however, the opposite is occurring: the City is attempting to create a limited public forum by temporarily reserving a portion of what is a traditional public forum for the limited expressive activity of particular groups or speakers.

Recently, the United States District Court for the Southern District of New York held that the City of New York created a nonpublic or limited public forum when it limited access to, and the expressive content of, painted fiberglass cows that were displayed throughout the five boroughs of New York City as part of a "cow parade." *People for the Ethical Treatment of Animals v. Giuliani, NYC 2000,* 105 F.Supp.2d 294, 319 (2000). In *Giuliani,* the court undertook a lengthy discussion of the law concerning traditional public forums and First Amendment rights. *Id.* at 311–20. It recognized that streets and parks are generally open to all members of the public, and that the First Amendment requires that strict scrutiny be satisfied to justify restrictions on speech in such a forum. *Id.* at 314. The court went on to state, however, that:

> [W]here the government, in order to serve legitimate purposes, carves out, within traditional public forum property,

a portion of space not open to the general public, either specifically or incidentally limiting some expressive activities to particular speakers or subjects, the [Supreme] Court has recognized the resulting forum as a nonpublic forum where regulation of speech is subject to a lower grade of First Amendment review.

*Id.*

Most importantly, the *Giuliani* court noted the competing interests between the plaintiffs who sought general access to traditional public places and the City of New York's interest in exercising control over its public property. *Id.* at 312. The court noted that in cases where these two competing interests have met head on the Supreme Court has endeavored to reach an equilibrium that "promote[s] broad public access for expressive purposes, while at the same time allowing government discretion to achieve the purposes for which public properties are intended in light of the various conflicting interests that often simultaneously compete for their use." *Id.* at 312–13. The *Giuliani* court further noted that even in traditional public forums not all property is accessible to all persons for all expressive activities. *Id.* at 315.

The *Giuliani* court found that the First Amendment does not command such a limited view of the government's authority to control its property that it cannot create a limited public forum out of a traditional public forum. *Id.* To adopt such a ruling, the court stated, would create an "all-or-nothing choice" for the government that would lead it to refrain from undertaking expressive activities which would curtail the expressive rights of the many in the name of the few. *Id.* at 315–16. The Supreme Court has raised the same concern as well. In *Lehman v. City of Shaker Heights,* where the Court upheld a ban on political advertising on city-owned buses,

the Court stated that "[w]ere we to hold to the contrary, display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require." *Lehman,* 418 U.S. at 304, 94 S.Ct. 2714.

 Here, the Court agrees with the reasoning of the *Giuliani* court that the First Amendment does not command such a limited view of the City's authority to control its public property that it cannot temporarily reserve a portion of what is a traditional public forum to hold a parade for the limited expressive activity of particular groups or speakers. If the City were so limited, it could never use public property for any event or purpose of a limited scope without proffering a compelling state interest. *Giuliani,* 105 F.Supp.2d at 315. The inevitable result would be that every public facility would, again, become a "Hyde Park[ ] open to every would-be pamphleteer and politician." *Lehman,* 418 U.S. at 304, 94 S.Ct. 2714. Therefore, the City could not sponsor a jazz festival in a park without having to allow a heavy metal, punk rock, or disco group the opportunity to perform as well. Nor could a major metropolitan city, such as New York, hold a parade celebrating a World Series victory by the New York Yankees on the streets of Manhattan without violating the First Amendment if it did not allow all other groups—including political groups—who wished to participate to enter the parade. The Court notes that the City has argued as much. Specifically, the City argues that if ordered to allow the Club to enter a float in the Parade displaying a sign that identifies the Club as the Parkland Republican Club then it would have to allow all political organizations and special interest groups the opportunity to

politicize the Parade without the ability to say no to any group. (Tr. at 10–11, 15, 61, 63.) Such a result ignores the City's interests in exercising control over its public property and achieving certain limited purposes in the face of the conflicting interests that compete for the use of public property. *Giuliani*, 105 F.Supp.2d at 312–13. The Court finds that leaving the City with such an "all-or-nothing choice" would be detrimental to the expressive rights of the many and is not warranted by the Constitution. *See Lehman*, 418 U.S. at 304, 94 S.Ct. 2714.

■ Based upon the foregoing analysis, the Court concludes that the City may create a limited public forum by temporarily reserving a portion of what is a traditional public forum for a limited purpose and for discussion of certain topics. *Perry*, 460 U.S. at 45 n. 7, 103 S.Ct. 948.

### 3. *Standard of Judicial Scrutiny*

■ Having determined that the relevant forum, the Parade itself, is a limited public forum, the Court must now apply the appropriate level of scrutiny. Here, the Court adopts the holding of *Rosenberger* and finds that the City's restriction need only be *"reasonable in light of the purpose served by the forum' ... [and] may [not] discriminate against speech based upon its viewpoint ...."* *Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510 (*quoting Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439) (citations omitted) (emphasis added). In applying this level of scrutiny, the Court notes in particular the distinction drawn by the Supreme Court between content discrimination, which is permissible if it preserves the purpose of the limited forum, and viewpoint discrimination, which is not permissible if directed at speech otherwise permitted within the forum. *Id.* at 830, 115 S.Ct. 2510.

■ Here, the Court finds that the City *has not* discriminated against the

Club based upon its viewpoint. The City uniformly excludes *all* political organizations from promoting themselves in the Parade. The City does not favor one political viewpoint while discouraging another. Rather, all political speech is excluded. Indeed, the City has, for the past thirty-seven years, consistently excluded all political groups from the Parade. (Defs.' Resp. at 1–2.) While it is true that some exceptions have been made and certain commercial interests have been allowed to promote themselves in the Parade, commercial speech is not at issue. What is at issue is political speech, and the City has consistently excluded all political organizations from the Parade. Therefore, the Court finds that the City has drawn a distinction between content discrimination and viewpoint discrimination, and that the City has not discriminated on the basis of viewpoint and has not offended constitutional standards. *Id.* at 830, 115 S.Ct. 2510.

Moreover, the City's restrictions are all the more constitutional when they leave open to the Club, as they do here, such "ample alternative channels of communication" as attending the festival at large, passing out literature, carrying signs and disseminating its message to other festival attendees. *Perry*, 460 U.S. at 45, 103 S.Ct. 948.

■ Next, the Court must determine whether excluding all political organizations from the Parade is "reasonable in light of the purpose served by the forum ...." *Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510 (*quoting Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439). The purpose of the Parade is to provide for fellowship and to allow the citizens of Parkland to get together in a fun, family-oriented, nonpolitical atmosphere. (Defs.' Resp. at 5; Hr'g Tr. at 7–8.) Here, the Court finds it reasonable to exclude all political organizations from the Parade in light of

its purpose to establish a nonpolitical atmosphere. The Court notes, again, that the Club is free to attend the festival at large and that its First Amendment right to express itself on the streets and parks of Parkland is not being restricted. Such "ample alternative channels of communication" lend support to the reasonableness of excluding political organizations from the Parade. *Perry*, 460 U.S. at 45, 103 S.Ct. 948. Therefore, the Court finds that the City's exclusion of political organizations is "reasonable in light of the purpose served by the forum," and that the City has not offended constitutional standards. *Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510 (*quoting Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439). The Court also finds that excluding political groups guards against turning every public facility into a "Hyde Park[ ] open to every would-be pamphleteer and politician." *Lehman*, 418 U.S. at 304, 94 S.Ct. 2714. It also enables the City to address the "various conflicting interests that often simultaneously compete" for the use of public properties, *Giuliani*, 105 F.Supp.2d at 312–13, and to protect the expressive rights of the many. *Id.* at 315–16.

The Second Circuit Court of Appeals recently reached a similar conclusion when it held that the Josie Robertson Plaza (hereinafter the "Plaza"), the city-owned fountain plaza located at the center of the Lincoln Center performing arts complex in Manhattan, New York, is not a traditional public forum and that a policy of limiting expressive activities in the Plaza to artistic

or performance-related events is constitutionally permissible because it is "viewpoint neutral and reasonable in relation to the forum's function and purpose." *Hotel Employees & Restaurant Employees Union, Local 100 of New York, N.Y. & Vicinity v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 555–57 (2d Cir. 2002). In *Hotel Employees*, the Union submitted an application requesting permission to hold a rally in the Plaza in support of food service workers employed by a food concessionaire operating in the Metropolitan Opera. *Id.* at 541–42. Lincoln Center for the Performing Arts, Inc. (hereinafter "Lincoln Center, Inc."), a nonprofit corporation that manages the Lincoln Center property, denied the application because the proposed use "violated its policy against non-arts-related events in the Plaza." *Id.*[2] The Union challenged the denial of its application on First and Fourteenth Amendment grounds.

On appeal the Union argued that the Plaza is a traditional public forum and that restrictions on speech in the Plaza are subject to strict scrutiny. *Id.* at 543–44. After consideration of the Plaza's location, use, function, and purpose, as well as the city's intention in building the Plaza, the Second Circuit rejected the Union's argument. Instead, the Second Circuit found that, because the Plaza was either a limited public forum or a nonpublic forum, restrictions on speech falling outside the limited category for which the Plaza was created need only be viewpoint neutral and reasonable in light of the Plaza's purpose. *Id.* at 553–54.[3] The Second Circuit held

---

**2.** Under a licensing agreement with the city of New York, Lincoln Center, Inc. had exclusive responsibility for scheduling events in the Plaza, subject to approval from the Parks Department. *Id.* at 540–41. Because the Second Circuit found no constitutional violation, it assumed, without deciding, that the licensing agreement rendered Lincoln Center, Inc. a

state actor for purposes of scheduling events in the Plaza. *Id.* at 544–45.

**3.** The Second Circuit found the distinction between a limited public forum and a nonpublic forum immaterial "because the Union's proposed activities [fell] outside the class of expressive uses for which the Plaza [had] been opened." *Id.* at 553–54.

that Lincoln Center, Inc.'s policy of limiting expressive uses of the Plaza to artistic or performance-related activities was both viewpoint neutral and reasonable in light of the Plaza's function and purpose. *Id.* at 553–55.

In reaching its holding, the Second Circuit specifically noted the city's "strong interest" in preserving the Plaza for its intended function, and stated that "permitting speech on all manner of public issues in the Plaza would compromise the City's ability to establish a specialized space devoted to contemplation and celebration of the arts." *Id.* at 552–53. The Second Circuit also noted that neighboring parks and public sidewalks surrounding the Plaza provided "ample alternative venues for groups such as the Union who wish to voice their views to Lincoln Center's patrons." *Id.* at 555–57 (*citing Cornelius,* 473 U.S. at 809, 105 S.Ct. 3439). Just as the Second Circuit found the restrictions on speech at issue in *Hotel Employees* constitutionally permissible because the restrictions were both viewpoint neutral and reasonable, and because the Union was free to exercise its First Amendment rights in the parks and on the sidewalks that surround the Plaza, the Court finds the restrictions on speech at issue here constitutionally permissible as well. The City's exclusion of *all* political organizations from participating in the Parade is both viewpoint neutral and reasonable in light of the Parade's purpose, and the Club is free to exercise its First Amendment rights by attending the festival at large and disseminating its message to Parade and festival attendees.

■■■ Finally, the Court notes that vesting broad discretion in a public official to permit or deny speech is unconstitutional. *Shuttlesworth v. City of Birmingham, Ala.,* 394 U.S. 147, 153, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Here, however, the Court finds that the City's policy is clear and unambiguous. In the thirty-seven year history of the Parade no political organization has been allowed to participate in the Parade in the manner proposed by the Club. (Defs.' Resp. at 2.) According to the City's policy, which is set by the Mayor and the City Commission, (Hr'g Tr. at 24), political organizations are not permitted to participate in the Parade in the manner proposed by the Club. The policy does not give the City Manager the discretion to permit some political organizations to participate in the Parade while excluding others based upon unbridled discretion. Rather, the City Manager is directed to exclude all political organizations from the Parade. Therefore, the Court concludes that the City's policy does not vest broad discretion in the City Manager to decide which organizations can and cannot enter the Parade, and, therefore, is not unconstitutional.

### B. *Other Elements*

Having found that the Club has not satisfied its burden of showing actual success on the merits of its claim, the Court need not consider the other elements of a permanent injunction.

### III. *Conclusion*

■■■ In closing, the Court finds that the Parkland Days Parade is a limited public forum. In that forum, the City's restriction upon the Club's First Amendment rights must be reasonable in light of the purpose served by the forum and viewpoint neutral. The Court further finds that the exclusion of all political organizations from a Parade whose purpose is to establish a fun, family-oriented, nonpolitical atmosphere is reasonable, and that the exclusion of all political organizations is viewpoint neutral. And again, the Court notes that this policy leaves open abundant alternative channels of communication for the Club to exercise its First Amendment

rights. Furthermore, the Court finds that the City's policy of excluding political organizations is clear and unambiguous and does not vest broad discretion in the City Manager.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. The Plaintiff, Parkland Republican Club's Emergency Motion For Preliminary Injunction, which the Court construes as a Motion For Permanent Injunction, be and the same is hereby **DENIED**;

2. The above-styled cause be and the same is hereby **DISMISSED**;

3. Final Judgment shall be entered separately by the Court; and

4. To the extent not otherwise disposed of herein, all pending Motions are hereby **DENIED** as moot.