**CALVARY CHAPEL CHURCH, INC., Plaintiff,**

v.

**BROWARD COUNTY, FLORIDA, Board of County Commissioners, et al., Defendants.**

**No. 03–61927–CIV**

United States District Court,
S.D. Florida.

Dec. 23, 2003.

---

Richard H. McDuff, Johnson, Anselmo, Murdoch, Burke & George, P.A., Fort Lauderdale, FL, Paul R. Alfieri, Fort Lauderdale, FL, for Plaintiff.

Andrew J. Meyers, Florida Department of Labor & Employment Security, Tallahassee, FL, James D. Rowlee, Broward County Attorney's Office, Fort Lauderdale, FL, for Defendants.

## PRELIMINARY INJUNCTION

ZLOCH, Chief Judge.

THIS MATTER is before the Court upon Plaintiff, Calvary Chapel Church Inc.'s Memorandum Of Law In Support Of Plaintiff's Motion For Preliminary Injunction (DE 2), which the Court construes as a Motion For Preliminary Injunction. An evidentiary hearing regarding this matter was held before the Court on November 14, 2003. The parties stipulate that the matter currently before the Court and at issue at the November 14, 2003 hearing is the issuance of a preliminary injunction, as opposed to a temporary restraining order or a permanent injunction. The Court has carefully considered said Motion, the entire court file and is otherwise fully advised in the premises.

### I. Background

#### A. The Holiday Fantasy of Lights

The Holiday Fantasy of Lights (hereinafter the "HFL") is an annual event presented by Defendant, Broward County, Florida, Board of County Commissioners (hereinafter the "County") in conjunction with the winter holiday season. The event originated in 1993, when, under the direction of Defendant, Robert L. Harbin, Director of the Broward County Parks and Recreation Division (hereinafter "Harbin"), the County developed the idea of presenting a show to entertain the community through recognition of the various holidays that occur during the winter months (R. at 256–57), and by which the County could generate revenue. (R. at 254). The HFL is held in Tradewinds Park (hereinafter the "Park"), and runs approximately from immediately before Thanksgiving Day in November until just after New Year's Day in early January. (R. at 253). The Park is normally closed at sundown, but during these months a designated area in the northern part of the Park is reopened after dark for the purpose of presenting the event. (R. at 252). Roughly 250,000 people visit the show each year. (R. at 255).

Substantively, the HFL consists of lighted displays measuring up to twenty-four (24) feet wide and fifteen (15) feet high. DE 2, p. 2. The displays are set up on a two-mile path through the Park and visitors drive through the display area. DE 2, p. 2. Additionally, the County broadcasts music over a low wattage radio station which visitors may play over their car radios. One of the songs played over the radio regards playing with a dreidel. (R. at 237). Each year, a list of the lighted displays which will comprise the event is selected by a Committee of the Broward County Parks and Recreation Division (hereinafter the "Committee") with ultimate discretion over selection resting with Harbin. (R. at 258). The County's intent in selecting displays is to provide entertainment through fanciful, lighthearted or whimsical but non-serious depictions relat-

ed to the entire winter holiday season. (R. at 257–60).

The County has two primary means of generating revenue through the HFL. The first is through ticket purchases of people wishing to see the show, and the second is through the sponsorship of the light displays. DE 13, Ex. 1, ¶ 5. Individuals and companies who sponsor displays are recognized at the HFL by a sign which identifies the sponsor in name and logo and is displayed next to the sponsor's chosen display. *Id.* Sponsors are also entitled to have their name and logo included in printed materials promoting the event. *Id.* In 2003, approximately sixty-three (63) displays will comprise the HFL, and seven (7) of those displays are presently sponsored. (R. at 235).

The County maintains a stated policy of not designing or accepting religious displays for exhibition in the HFL. (R. at 260). Until August of 2003, the County's policy dictated that sponsors could pick a display to sponsor from the list approved by the Committee, or, in the alternative, sponsors could submit a proposed display design. DE 13, Ex. 1, ¶ 7. On August 5, 2003, the County produced a written policy which states that a sponsor may choose a display from the Committee approved list, but may no longer propose a display. DE 13, Ex. 1, ¶ 12. According to the written policy, the Committee chooses displays which are "fanciful" and "based on a logical connection to the event's limited purpose of maximizing a light-hearted entertainment experience for people of all ages, but most particularly for children." DE 2, Ex. F, p. 2. The written policy further states: "Selected displays are consistent in scale and are compatible in theme and illumination with the event's purpose of a fun-filled, family-oriented entertainment experience." *Id.* The Court notes, however, that the written policy has not been consistently enforced, and that Harbin testified that he is not strictly bound to comply with it. (R. at 178). Accordingly, sponsors are still entitled to choose from one of the designs chosen by the Committee, and the possibility exists that were a sponsor to propose a design satisfactory to Harbin, that design would be included as well.

The County's policy of allowing sponsors to propose displays resulted in the approval and display of a design depicting an octopus holding presents in each of its tentacles. The design was proposed by a local company, Pino Tile, Inc., and is almost identical to the company's logo, which depicts an octopus holding tiles in its tentacles. This practice of adopting corporate logos for use in the HFL was also exhibited in the County's efforts to design displays intended to attract other sponsors. For example, a local Ford Dealership, uses an alligator as its logo. The County considered a design which would depict an alligator with a ribbon around his neck in an effort to gain the sponsorship of the Dealership. (R. at 233). The changes to these logos, whether actual or proposed, give the logos a visual association with the winter holiday themes of decoration and giving and receiving wrapped gifts.

The Committee also designed or approved a number of displays not depicting a corporate logo, but reflecting imagery associated with the winter holidays season, including the Christmas holiday. The Court notes that the 2003 Sponsorship Book (DE 13, Ex. A) makes available for sponsorship a forty (40) foot "Rainbow Tree" display, which appears in its shape and decoration to be a Christmas tree; a "Victorian Candy Shop," which depicts a house adorned with candy canes, holly, and bows; a display depicting "Victorian Carolers Singing"; a "Country Christmas Toboggan Scene"; a "Santa, Sleigh, and

Reindeer Scene"; a scene depicting a "Country Tree Trimming"; a "Holiday Shopping Bag with Packages Scene" depicting toys and a candy cane emerging from a bag; a scene depicting "Santa Golfing"; and a display containing the words, "And to all a goodnight."

### B. Calvary Chapel Church, Inc. and the Holiday Fantasy of Light

In 2002, Plaintiff, Calvary Chapel Church, Inc. (hereinafter "Calvary Chapel" or the "church") applied to sponsor the HFL and submitted a proposed display to the County composed of a Christmas star and the words, "Remember Him—Presented by Calvary Chapel Ft. Lauderdale." Citing the display's overtly religious message, the County declined to include it in the show. (DE 13, p. 4). Calvary Chapel and the County eventually came to an agreement that a display would be included in the show, sponsored by Calvary Chapel, with the Christmas star and the words, "God Bless America." (R. at 271, Pl.'s Ex. 15). According to Harbin, the County accepted the display for the show because they did not want to lose a sponsor, and because the display had a patriotic theme. (R. at 271).

On April 8, 2003, Calvary Chapel again submitted a proposed display to the County for inclusion in the HFL. The proposed display depicted a cross and the words, "Jesus is the Reason for the Season." Again objecting to the religious nature of its design, the County declined Calvary Chapel's proposed display. (DE 2, Ex. B). The parties discussed alternative designs, including ones not previously approved by the Committee but ultimately were not able to reach agreement. (R. at 277).

The above-styled cause was initiated on October 22, 2003. Calvary Chapel's Memorandum Of Law In Support Of Plaintiff's Motion For Preliminary Injunction (DE 2) requests that the Court issue an injunction requiring the County to permit Calvary Chapel to sponsor a display in the 2003 HFL consisting of a cross and the words, "Jesus is the Reason for the Season— Calvary Chapel Fort Lauderdale."

### II. Preliminary Injunction Standard

The Court notes that in order to obtain a preliminary injunction Plaintiff must show that: (1) it has a substantial likelihood of success on the merits; (2) there is a substantial threat that it will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to it outweighs the harm the injunction may do to Defendant; and (4) granting the injunction will not disserve the public interest. *Suntrust Bank v. Houghton Mifflin Co.*, 252 F.3d 1165, 1166 (11th Cir.2001). The Court further notes that, in the Eleventh Circuit, a preliminary injunction is considered an extraordinary and drastic remedy that should not be granted unless Plaintiff can clearly establish the burden of persuasion as to each of the four elements. *Café 207 v. St. Johns County*, 989 F.2d 1136, 1137 (11th Cir.1993).

### A. Substantial Likelihood of Success

In determining whether a public entity's regulation of speech violates a speaker's First Amendment Freedom of Speech rights the Court must consider three issues. First, the Court must identify the type of speech being regulated. Second, the Court must determine the nature of the relevant forum and the accompanying level of scrutiny which the Court must apply in considering regulations on speech within that forum. Finally, the Court must assess whether "the justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius v. NAACP Legal Defense & Ed. Fund*, 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

### 1. Type of Speech

■ It is well established that private religious speech is protected by the First Amendment. *See, e.g., Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (citations omitted) ("Our precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression."). Like the display involved in *Capitol Square*, Calvary Chapel's proposed display—a cross with the words "Jesus is the reason for the Season"—is private religious expression within the First Amendment's protection. *See id.* at 758, 115 S.Ct. 2440 (discussing the display of a cross on public property).

### 2. The Nature of The Forum

■ Following the analysis outlined by the United States Supreme Court, the Court must next determine the nature of the forum present in the above-styled cause. *See Cornelius*, 473 U.S. at 797, 105 S.Ct. 3439. The Court notes, however, that the Government, regardless of the nature of the forum, may not discriminate based on the viewpoint which a speaker seeks to express. *See Good News Club v. Milford Cent. School*, 533 U.S. 98, 106–07, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001); *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 391–93, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993).[1]

"As a general rule, government ownership of property does not automatically open that property to the public." *Uptown Pawn & Jewelry, Inc. v. City of Hollywood*, 337 F.3d 1275, 1278 (11th Cir. 2003) (citing *United States v. Kokinda*, 497 U.S. 720, 725, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990)). Courts generally have divided governmental property into three categories: traditional public fora, limited public fora[2] and non-public fora. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 976 (9th Cir.1998) (White, J., sitting by designation).

■ A traditional public forum is a place, like a public park or street, "that has traditionally been available for public expression." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). In a traditional public forum any regulation of speech is governed under strict scrutiny. *See Uptown Pawn*, 337 F.3d at 1278 (citing *Kokinda*, 497 U.S. at 730, 110 S.Ct. 3115). The regulation, therefore, must be narrowly drawn and necessary to achieve a compelling state interest. *Perry*, 460 U.S. at 45, 103 S.Ct. 948 (citing *Carey v. Brown*, 447 U.S. 455, 461, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980)).

■ Limited public fora are those public areas that the government "has opened for use by the public as a place for expressive activity." *Id.* This type of forum can be

---

1. As discussed below, the only possible exception to this rule is where viewpoint discrimination is necessary to a compelling state interest. *Good News Club*, 533 U.S. at 112–13, 121 S.Ct. 2093 (citing *Widmar v. Vincent*, 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981)).

2. The Court notes that there is disagreement regarding the definition and subsequent standard to be applied to "designated" public fora. Depending on the language and intent of the government, a designated public forum may be so broad as to resemble a traditional public forum or narrow as to mimic a non-public forum. This Court, however, equates designated public fora and limited public fora. *See Parkland Republican Club v. City of Parkland*, 268 F.Supp.2d 1349, 1354 (S.D.Fla. 2003).

"created for a limited purpose such as use by certain groups ... or for the discussion of certain subjects ...." *Id.* at 45 n. 7, 103 S.Ct. 948 (*citing Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) and *City of Madison Joint School Dist. v. Wis. Employment Relations Comm'n*, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976)). In a limited public forum, the Government may restrict speech to the groups or topics for which the forum has been created, however, any such restriction must be reasonable and may not discriminate on the basis of viewpoint. *Good News Club*, 533 U.S. at 106–07, 121 S.Ct. 2093 (*citing Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) and *Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439).

■ Finally a non-public forum is one where public property is not by "tradition or designation a forum for public communication ...." *Perry*, 460 U.S. at 46, 103 S.Ct. 948. Such a forum exists where the Government acts in its position as proprietor to manage its own internal operations, as opposed to using its power as a regulator or lawmaker. *See Uptown Pawn*, 337 F.3d at 1278. For First Amendment purposes, the regulation of speech in non-public fora is "examined for reasonableness and viewpoint neutrality." *Id.* (*citing Kokinda*, 497 U.S. at 730, 110 S.Ct. 3115). Thus, in a non-public forum, the Government may make distinctions based on subject matter and speaker identity, but it may not discriminate based on the speaker's viewpoint. *Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439 (*citing Perry*, 460 U.S. at 49, 103 S.Ct. 948); *see also Children of the Rosary*, 154 F.3d at 981 (holding that it is not viewpoint discrimination to exclude all but commercial speakers).

In defining the relevant forum, the Supreme Court has "focused on the access sought by the speaker." *Cornelius*, 473 U.S. at 801, 105 S.Ct. 3439. In its Complaint (DE 1), Calvary Chapel alleges that its application to participate in the County's 2003 HFL was wrongfully denied. Moreover, in the instant Motion (DE 2), Calvary Chapel seeks to have the Court issue a preliminary injunction requiring the County to include the church's display in the HFL. Additionally, Robert J. Coy, Calvary Chapel's senior pastor, testified that the church is seeking access to the HFL. (R. at 219). Accordingly, based on Calvary Chapel's allegations and the testimony offered during the evidentiary hearing, the relevant forum is the HFL. *See id.* ("When speakers seek general access to public property, the forum encompasses that property. In cases in which limited access is sought, our cases have taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property.").

■ The HFL is a non-public forum. Though it is held in a public park, the HFL occurs after dark in a designated section of the Park which is closed except for the HFL. DE 13, Ex 1, ¶ 3. Moreover, the parties agree that the HFL is not a forum for general discussion, but rather is limited to recognition of the winter holiday season, including Christmas. DE 2, p. 3 and Ex. F, p. 2. Additionally, the testimony of Harbin and Defendant, Shelly Turetzky support a finding that the County established and continues to operate the HFL in its role as a proprietor of land and with the intent of generating revenue. (R. at 226–27, 256). Based on this combination of facts—use of an otherwise closed area, a focus on limited content, and the intention of generating revenue—the HFL is a non-public forum. *See Uptown Pawn*, 337 F.3d at 1279.

### 3. Non-public forum review

As stated above, the justification for the regulation of speech in a non-public forum must be reasonable in so far as the regulation makes distinctions based on subject matter or speaker identity; however, such regulation must be viewpoint neutral. *See Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439 (*citing Perry*, 460 U.S. at 49, 103 S.Ct. 948); *Uptown Pawn*, 337 F.3d at 1278 (*citing Kokinda*, 497 U.S. at 730, 110 S.Ct. 3115); *Children of the Rosary*, 154 F.3d at 978–79 (*citing Perry*, 460 U.S. at 49, 103 S.Ct. 948 and *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998)).

In the instant Motion (DE 2), there is no allegation that the County has excluded the church based on its identity. Calvary Chapel, a religious organization, is able to participate in the HFL and participated in the 2002 HFL in the same manner as commercial entities, such as Pino Tile, Inc., or any other organization or individual. Based on the evidence and testimony presented the only qualification on speakers is their ability to pay.

The parties dispute, however, whether the County's policy as applied to Calvary Chapel's proposed display is a regulation based on content or viewpoint. Specifically, Calvary Chapel maintains that its proposed display represents a religious viewpoint of the winter holiday season and specifically Christmas. Calvary Chapel points to the County's allowance of secular and commercial Christmas displays such as Santa Claus with a sleigh pulled by reindeer, Christmas trees and a variety of displays of presents to show that the Christmas holiday is a subject of the HFL. Additionally, Calvary Chapel maintains that the display of a dreidel and the broad-casting of a song about playing with a dreidel is a religious viewpoint of the Jewish holiday of Hanukkah. Indeed, the testimony shows that the County voluntarily displays the dreidel and broadcasts the related song.

Conversely, the County maintains that it excludes all overtly religious, overtly political and overtly commercial subject matter because those topics have the potential to cause controversy or distract from the "fun", "lighthearted" and "fanciful" themes of the HFL. The County maintains that these subject matter exclusions are rationally related to its goals of generating revenue and providing entertainment. Additionally, the County claims that all of the displays including those specified by Calvary Chapel depicting Santa Claus, Christmas trees and a dreidel are secular and are "fun," "lighthearted" or "fanciful" and thus are within the subject matter of the HFL.[3]

The United States Supreme Court has addressed the same question on similar facts in *Good News Club v. Milford Cent. School*, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) and *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). In both cases the Court addressed application of a New York State law authorizing local governments to restrict the use of public school property during non-school hours which the Court, in both cases, held to be non-public fora and thus governed by the reasonable and viewpoint neutral standard. *See Good News Club*, 533 U.S. at 106–07, 121 S.Ct. 2093 (citations omitted); *Lamb's Chapel*, 508 U.S. at 392–93, 113 S.Ct. 2141 (citations omitted).

---

**3.** The Court notes that the parties also disagree regarding whether displays of a paratrooper, a tank and a humvee are patriotic, fanciful or warlike. This issue is irrelevant to the outcome of this Motion.

In *Lamb's Chapel*, the Court addressed a local school district's rejection of an evangelical church's application to use school facilities to show a six-part film series addressing family values from a Christian perspective. 508 U.S. at 388–89, 113 S.Ct. 2141. Rejecting the application twice, the school district stated that the film was "church related." In making this determination the school district relied on a rule adopted pursuant to New York law which prohibited use of school facilities "by any group for religious purposes." *Id.* The Court held, however, that the application of this rule's equal prohibition against all religious purposes is insufficient to justify rejection of the church's application because the film concerned a subject matter—i.e. family values—otherwise appropriate under the rules regarding use of the school facilities. *See id.* at 394, 113 S.Ct. 2141. The Court held, therefore, that the school district violated the church's First Amendment right to expression in that the school district discriminated against the church's religious viewpoint on an otherwise permitted subject matter. *See id.* at 393–94, 113 S.Ct. 2141.

More recently, the Court applied the *Lamb's Chapel* holding to the facts of *Good News Club*. In that case, a private Christian organization for children applied to the local school board for permission to use school facilities for its meetings. The local school board rejected the application under a rule, adopted pursuant to New York law, which prohibited use "by any individual or organization for religious purposes." *Good News Club*, 533 U.S. at 103–04, 121 S.Ct. 2093. As in *Lamb's Chapel*, the Court held that the school board acted in violation of the Christian group's First Amendment rights in that the group sought access to school facilities to discuss morals and character development from a religious viewpoint. *See id.* at 108, 121 S.Ct. 2093. Rather than excluding the subject matter of religion, the Court held, the school board unconstitutionally discriminated against the Christian group's religious viewpoint on an issue otherwise permitted in the forum. *See id.* at 109–10, 121 S.Ct. 2093.

At the HFL the subject matter open for expression is the winter holiday season, including Christmas. The County permits the sponsorship of displays regarding the secular viewpoint of Christmas (i.e. Santa Claus with a sleigh pulled by reindeer and Christmas trees), the commercial viewpoint of Christmas (i.e. that the holiday is a time for the giving and receiving of decoratively wrapped gifts) and the fanciful viewpoint of Christmas (i.e. various animals and figures participating in gift giving and winter time activities). The County, however, rejected Calvary Chapel's application to sponsor a display representing a religious viewpoint of Christmas (i.e. a cross and the words, "Jesus is the reason for the season"). *C.f. County of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 579, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) ("As observed in this Nation, Christmas has a secular, as well as a religious, dimension."). Following the reasoning of the Supreme Court, a display which is "overtly religious" in nature may also be characterized as reflecting the holiday of Christmas from a religious viewpoint. *See Good News Club*, 533 U.S. at 111, 121 S.Ct. 2093.

■ In sum, the County created a non-public forum, or at most a limited public forum, in which sponsors may recognize the winter holiday season including Christmas. Accordingly, the County may exclude other subject matter. But, whatever the term used to describe this forum, the County may not exclude alternative viewpoints with respect to the holidays includ-

ed in the HFL. *It is a violation of Calvary Chapel's First Amendment rights, therefore, to exclude its religious viewpoint of the holiday of Christmas.*

### 4. The Establishment Clause Defense

The Court notes that "the government may acknowledge Christmas as a cultural phenomenon" without triggering First Amendment Establishment Clause[4] concerns. *See Allegheny,* 492 U.S. at 601, 109 S.Ct. 3086. Establishment Clause concerns may serve as a compelling state interest such that viewpoint discrimination in the freedom of speech context may be necessary and, therefore, not unconstitutional. *See Good News Club,* 533 U.S. at 112–13, 121 S.Ct. 2093 (*citing Widmar,* 454 U.S. at 271, 102 S.Ct. 269 and *Lamb's Chapel,* 508 U.S. at 394–95, 113 S.Ct. 2141). In light of these concerns it is necessary to consider whether inclusion of Calvary Chapel's proposed display in the HFL would violate the Establishment Clause.

> As it has stated, the Supreme Court has come to understand the Establishment Clause to mean that government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs.

*Allegheny,* 492 U.S. at 590–91, 109 S.Ct. 3086 (internal footnotes omitted). According to the Supreme Court, to avoid Establishment Clause problems the government must satisfy three requirements: "The challenged governmental action has a secu-

lar purpose, does not have the principal or primary effect of advancing or inhibiting religion, and does not foster an excessive entanglement with religion." *Lamb's Chapel,* 508 U.S. at 395, 113 S.Ct. 2141 (*citing Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)). Thus the concern in a case such as this, is that "the community would think that the [County] was endorsing religion or any particular creed, and [providing a] benefit to religion or to [Calvary Chapel]," *id.,* or that "observers would reasonably believe that the government's [approval of Calvary Chapel's application] sends a message of governmental endorsement of religion." *King v. Richmond County, Ga.,* 331 F.3d 1271, 1282 (11th Cir.2003) (*citing Allegheny,* 492 U.S. at 598–600, 109 S.Ct. 3086) (additional citations omitted).

█ Unlike the factual situations of *Lamb's Chapel* and *Good News Club,* within the HFL, Calvary Chapel's proposed display will appear side-by-side with unsponsored displays erected by the County. Moreover, based on the evidence including photographs of displays and a video of a previous HFL presented during the evidentiary hearing, the sponsorship signs which accompany sponsored displays are not obvious to the casual observer. Thus, it is possible for the community to view Calvary Chapel's proposed display as an endorsement by the County of the religious message contained therein. It is necessary, therefore, that Calvary Chapel's proposed display be modified to state "Calvary Chapel says—Jesus is the reason for the Season" to avoid the potential for an Establishment Clause violation thru any argument that the County endorses Calvary Chapel's viewpoint. With this modifica-

---

4. The so-called Establishment Clause reads as follows: "Congress shall make no law respecting an establishment of religion ...." U.S. Const. amend. I. This prohibition has been applied to the states via the Fourteenth Amendment. *See Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

tion no reasonable observer can construe this allowance as an endorsement by the County of Calvary Chapel's religious viewpoint.

### 5. Free Exercise and Establishment Clause Claims

The Court notes that, in the instant Motion (DE 2), Calvary Chapel claims that in addition to its freedom of speech claim a preliminary injunction is also appropriate pursuant to the Free Exercise and the Establishment Clauses of the First Amendment. Calvary Chapel, however, dedicated the bulk of its arguments, evidence and testimony to addressing the freedom of speech issue. In accordance with the lack of emphasis placed on these claims by Calvary Chapel and the fact that the Court has already found that Calvary Chapel is, for preliminary injunction purposes, likely to succeed on the freedom of speech issue, the Court does not, in considering the instant Motion, undertake an analysis of the Free Exercise and the Establishment Clause claims.

### 6. The Florida Religious Freedom Restoration Act

Lastly, Calvary Chapel also claims that injunctive relief is available pursuant to its Florida Religious Freedom Restoration Act (hereinafter "RFRA"), Fla. Stat. ch. 761 (2003), claim. RFRA provides that the government shall not substantially burden a person's exercise of religion unless the government has a compelling state interest, and the burden is the least restrictive means of furthering the compelling interest. Fla. Stat. ch. 761.03. Calvary Chapel claims that RFRA extends to religiously motivated conduct a higher degree of protection than that afforded by the First Amendment.

The Court notes that RFRA was enacted in 1998 and that there is little case law interpreting and applying the statute. Moreover, in *Warner v. City of Boca Raton*, 267 F.3d 1223 (11th Cir.2001), the Eleventh Circuit certified questions to the Florida Supreme Court addressing the extent to which the RFRA provides a higher degree of protection than federal law. 267 F.3d at 1227. The questions have not yet been answered and, therefore, Florida law in this area is unsettled. *See Wilson v. Moore*, 270 F.Supp.2d 1328, 1357 (N.D.Fla. 2003). Accordingly, the Court declines to exercise supplemental jurisdiction over this state law claim and the so-called "Fifth Cause Of Action" contained in Calvary Chapel's Complaint (DE 1) is dismissed.

### B. Irreparable Injury

The Court notes that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable harm." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Here, if the Court does not grant the injunction Calvary Chapel will be irreparably harmed by not being allowed to participate in the HFL. Therefore, the Court concludes that Calvary Chapel has established the burden of persuasion as to this element.

### C. Calvary Chapel's Threatened Injury Versus Harm to the County

As noted above, "private religious speech ... is as fully protected under the Free Speech Clause as secular private expression." *Capitol Square*, 515 U.S. at 760, 115 S.Ct. 2440. The threatened injury to Calvary Chapel if it is not allowed to express its religious viewpoint is violation of its First Amendment right of free speech. The County, on the other hand, has not presented evidence of any harm the inclusion of a religious viewpoint in the HFL would cause, because no reasonable observer could construe this allowance as an endorsement by the County of Calvary

Chapel's religious viewpoint. The County seeks to avoid any potentially divisive images from inclusion in the show (R. at 247), but there has not been evidence showing that the presence of a religious viewpoint of the holidays would be divisive.[5] Accordingly, the Court finds that Calvary Chapel has met its burden of persuasion in showing that the threatened harm to it outweighs the threatened harm to the County.

### D. *Serving the Public Interest*

In allowing the Calvary Chapel to participate in the HFL, the Court can discern no public harm to the citizens of Broward County or others who might be in attendance, particularly once the proposed display is modified so as to satisfy the Establishment Clause by avoiding any implication of endorsement by the County of any religious viewpoint. Furthermore, the Court finds that the public interest in enjoying an event that is not limited by viewpoint discrimination is high. Therefore, the Court finds that Calvary Chapel has established the burden of persuasion as to this element.

### III. *Conclusion*

In consideration of the applicable legal standards for the issuing of a preliminary injunction, the Court finds that Calvary Chapel has met its burden of persuasion as to all four elements. More specifically, the Court finds that Calvary Chapel established a substantial likelihood of success on the merits by showing that the County engaged in unconstitutional viewpoint discrimination with regard to the proposed display expressing a religious viewpoint of the winter holiday season. The Court further finds that Calvary Chapel would suffer irreparable injury were the injunction not to issue because it would be precluded from participating in the 2003 HFL. Finally, the Court finds that the threatened harm to Calvary Chapel should an injunction not issue outweighs the harm of an injunction to the County, and that issuing a preliminary injunction serves the public interest because the forum will not thereby be limited by unconstitutional viewpoint discrimination.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. Plaintiff, Calvary Chapel Church, Inc.'s Memorandum Of Law In Support Of Plaintiff's Motion For Preliminary Injunction (DE 2), which the Court construes as a Motion For Preliminary Injunction be and the same is hereby **GRANTED** and Defendants, Broward County, Florida, Board Of County Commissioners, Roger J. Desjarlais, Bob Harbin, and Shelly Turetzky shall permit Calvary Chapel to sponsor its proposed display in the 2003 Holiday Fantasy of Light as modified by this Order; and

2. The Fifth Cause Of Action of Plaintiff, Calvary Chapel Church, Inc.'s Complaint (DE 1) be and the same is hereby **DISMISSED**, without prejudice, as this Court declines to exercise supplemental jurisdiction over the same.

---

**5.** The Court notes that there was evidence and testimony regarding the loss of a sponsor arising out of the current controversy. (R. at 236). This sponsor, however, was concerned with liability related to the above-styled cause and did not withdraw out of concern that Calvary Chapel may be permitted to participate in the HFL.