Sandra SNOWDEN, Plaintiff,

v.

TOWN OF BAY HARBOR ISLANDS, FLORIDA; Isaac Salver, Mayor of Bay Harbor Islands; and Greg Tindle, Town Manager of Bay Harbor Islands, Defendants,

No. 04–23012–CIV–ALTONAGA/BANDSTRA.

United States District Court, S.D. Florida, Miami Division.

Dec. 15, 2004.

Edward Lawrence White, III, Thomas More Law Center, Ann Arbor, MI, Dina Vittoria Cellini, Bal Harbour, FL, for plaintiff.

Craig Barry Sherman, Frank Christopher Simone, Sherman Law Offices, Edmund Bruce Johnson, Tamara M. Scrudders, Johnson Anselmo Murdoch Burke Piper & McDuff, Fort Lauderdale, FL, for defendants.

*ORDER ON PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, MOTION FOR PRELIMINARY INJUNCTION*

ALTONAGA, District Judge.

THIS CAUSE came before the Court for a hearing on December 7, 2004, on Plaintiff, Sandra Snowden's (hereinafter "Snowden") Motion for Temporary Restraining Order or, in the Alternative, Motion for Preliminary Injunction, (D.E. 2) filed on December 2, 2004. The Court has carefully considered the written submissions of the parties and the arguments and authorities presented.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff has sued Defendants, Town of Bay Harbor Islands, Florida (hereinafter the "Town"), Isaac Salver, its Mayor, in his personal and official capacities (hereinafter the "Mayor"), and Greg Tindle, the Town Manager (hereinafter the "Manager"), also in his personal and official capacities, as a result of denials of her requests to be permitted to display Nativity scenes on public property. Plaintiff's Complaint for Damages, Declaratory and Injunctive Relief (D.E. 1) alleges three claims for relief: the first claim is for violation of freedom of speech, the second claim is for violation of the Establishment Clause, and the third is for violation of equal protection. In her prayer for relief, Plaintiff seeks a declaration that Defendants have violated her constitutional rights, injunctive relief enjoining Defendants from enforcing a policy and practice regarding the display of religious and holiday symbols, and the award of her nominal damages and attorney's fees.

The following facts have been presented in support of Plaintiff's request for a temporary restraining order or preliminary injunctive relief. The Town, consisting of approximately 5,000 residents and 2,300 registered voters, owns Causeway Island, upon which there is a grassy area approximately 760 feet long by 140 feet wide dividing State Road 922. The Island is surrounded by Broad Causeway, a road upon which motor vehicles travel at moderate[1] rates of speed because of the presence of a toll booth at the entrance of the Causeway. While there are no public parking spaces adjoining the grassy area,[2] there is parking associated with nearby toll booths and a nearby gas station.

Plaintiff maintains that the grassy area or median dividing Causeway Island (that grassy area hereinafter being referred to as "Causeway Island") is public, and has been used by the public to walk on, ride bicycles on and fly kites. Indeed, there are no signs on Causeway Island indicating that people or pets may *not* be present. The Town disputes that Causeway Island is a park or public forum as it has never been designated as such by the Town, and it has no public parking spaces, no sidewalks, no benches, no bathrooms, and no recreational facilities. The Town maintains that the grassy area has never been freely open to the public because of the danger posed from vehicular traffic to persons who would seek to enter or exit the same. Upon a first-hand observation of the small size, configuration, and lack of park-like amenities on Causeway Island,

---

1. The Court is unpersuaded by the Town's position that vehicles travel at high rates of speed, given the existence of the toll booths on the Causeway.

2. Snowden believes the parking spaces alongside the gas station are public property, but makes the statement only upon "information and belief." (December 9, 2004 Declaration of Sandra Snowden). The Town maintains the parking is not public property.

the Town's characterization appears to be the more correct one.

The controversy between the parties has its origins in December of 2001. Specifically, on December 3, 2001, the Mayor, who was then a member of the Town Council, proposed that the Shul, an Orthodox Jewish synagogue located in the nearby town of Surfside, Florida, and of which he was also a member, be allowed to erect a stainless steel menorah on Causeway Island. As reflected in the official minutes of the meeting:

> Councilman Salver explained his request was a result of him being approached by several residents, who in anticipation of the coming holiday of Chanukah, had asked that the Town allow the Shul to erect a menorah on public property.
>
> \* \* \* \* \* \*
>
> The Rabbi of the Shul of Surfside stepped up to the podium and spoke on various aspects related to the issue. He stated that from a legal perspective, there was no problem in approving the menorah, because the issue had already been dealt with up to the level of the Supreme Court and it had been decided that the menorah is not considered to be a religious symbol but a symbol of freedom ....
>
> \* \* \* \* \* \*
>
> Mr. Martin Wiescholek ... objected to the Town allowing the menorah placed [sic] on public property since he felt it represents a religious symbol and other people might feel offended by it. *He stated that if the Town allowed a particular religion [sic] symbol to be erected in public property everybody else should be allowed to display their symbols as well* ....
>
> \* \* \* \* \* \*
>
> Attorney Sherman commented there is case law in support of the Menorah being secular and not religious, and if not considered secular, *the Council would have to provide the same opportunity to other symbols. He stated that the Council might be setting a precedent to a certain extent* but it would have to deal with it and that each case would have to stand on its own ....

(Plaintiff's Motion, Ex. 2)(emphasis added to original).

After the discussion concluded, and with no articulated standards guiding its decision, the Town Council voted unanimously to have the menorah placed on Causeway Island, near an electrical power source provided and paid for by the Town. The Shul provided a 14–foot high menorah to the Town, and it was so lighted and displayed on Causeway Island that December. Temporary, colorful sailboat decorations also appeared alongside the menorah. This combined display of lighted menorah and colorful sailboats continued to appear in November and December of the years 2002 and 2003 without any reappearance or renewed request by the Rabbi or a representative of the Shul before the Council identifying that organization's continued ties to the menorah, but also without any directive by the Council to staff that it be re-erected.

Furthermore, for the three years in question, 2001–2003, the Town also placed temporary illuminated displays on light poles in the downtown areas along Kane Concourse (96 Street), a state road, of six, approximately 6–foot tall, blue and white Stars of David, six, 8–foot tall, blue and white menorahs, and an unknown number of poinsettias. Unlike the situation presented with the display on Causeway Island, there is no record evidence as to the date these lighted displays first appeared, or their origin.

On December 2, 2003, Snowden, a Town resident, faxed a letter to then-Mayor Linda Zilber, then-Vice-Mayor Isaac Salver, and Tindle, explaining her background as

an author in the field of international protocol, her background in international diplomacy, and her experience in advising private and public entities in her areas of expertise. She indicated that "for the past few years I have been deeply offended by the holiday decorations along Kane Concourse." (Plaintiff's Motion, Ex. 5). She asked to be permitted to "jump on board immediately and work with our students, city officials and our diverse community to reflect an international holiday in our town." (*Id.*).

Mayor Zilber called Snowden at her home on December 6. Mayor Zilber explained that Salver would be sending her a written response which the Mayor disagreed with and which, incidentally, was not to be considered a response from the Town. Mayor Zilber agreed that the Star of David was a Jewish symbol and that the decorations in the Town should be more inclusive. Mayor Zilber also informed Snowden that there would be a Town Council meeting on December 8, 2003.

Salver's letter, which included an "excerpt from the Supreme Court's ruling on religious holiday decorations for your records" (Plaintiff's Motion, Ex. 6), opined that the decorations (referring to the lighted displays along Kane Concourse) were indeed diverse. Moreover, he informed Snowden that the Town spent "more money on Halloween (traditionally the Eve of All Saints day) than all other celebrations combined." (*Id.*) He observed it was "sad to see one get 'deeply offended' by something as trivial as holiday decorations," (*id.*), and suggested she become involved with the Town's Community Enhancements Project. The record does not reveal what this Project is or was.

Snowden then attended the December 8, 2003 Town Council meeting, and asked to be permitted to place a Nativity scene on Causeway Island. She indicated she was willing to place a disclaimer by the Nativi-

ty scene or creche, indicating it was her personal display. Her request was denied on the basis that it was too late in the year to put up the display. She was advised the issue would be reconsidered in January of 2004. After another citizen requested that the matter be reconsidered before January, and Snowden proceeded to again speak on the matter, then-Mayor Zilber "abruptly ended the meeting in protest, calling for a motion that was seconded. The members of the Town Council, except for Mr. Lynch [a Council member], all got up in protest and walked out of the chambers." (Plaintiff's Motion, Ex. A, ¶ 13). It is unclear why Mayor Zilber abruptly ended the meeting, and the minutes of that meeting have not been provided.

Thereafter, Snowden had communications concerning the issue with Tindle and Bay Harbor Police Chief John Ross. She suggested holding a living Nativity in the Town, involving a presentation by live "actors," and Tindle advised he would first have to check with the Town Council. Tindle did in fact get back to Snowden, and advised her that "if the Town allowed [her] to hold a living Nativity on Causeway Island, that [she] would have to agree to sign a paper that [she] would discontinue any further protest in the Town, that [she] would not ask for a free standing Nativity to be displayed on public property in the Town, and that [she] would not bring legal action against the Town." (Plaintiff's Motion, Ex. A, ¶ 16). She refused.

What occurred next was quite extraordinary. According to Snowden, in December of 2003, Salver called Snowden's landlord and allegedly stated she was a "Jew hater," and spoke to the landlord about having Snowden evicted from her apartment. Then, Salver called the landlord's father, who also attended the Shul in Surfside, and tried to have the father ask the son-landlord to have her evicted. Accord-

ing to a February 29, 2004 article in the *South Florida Sun–Sentinel,* Salver admitted,[3] " 'I just thought it might be important for a Holocaust survivor [the landlord's father] to know what's going on in our town,' . . . referring to his efforts to alert the landlord's parents." (Plaintiff's Motion, Ex. 7).

Relevant discussion took place at a January 12, 2004 Town Council meeting, during which the Council members "directed staff to include decorations from the various holidays which are celebrated in the month of December." (Plaintiff's Motion, Ex. 8). Snowden repeated her request to be permitted to display a Nativity scene on public property, and it is unclear what, if any response, this engendered since, again, the minutes of this meeting were not supplied.

At a March 8, 2004 meeting, the Council voted to allow the continued display of the menorah and sailboats, and to add a 14–foot decorated Christmas tree. In place of the earlier decorations along Kane Concourse, the Council voted to display eight menorahs, eight Christmas trees and eight snowflakes on the lampposts. These actions were taken following a written recommendation by the Assistant to the Town Manager, J.C. Jimenez, and at a proposed cost to the Town of $8,602.50. J.C. Jimenez further stated that: "It is the Staff's recommendation to allow only Town sponsored decorations on Town Property per the plan as described in this memorandum." (*Id.*). The actions were also taken after public workshops and public Town meetings dealing with the 2004 holiday decorations, in which Plaintiff was the only resident who requested that a Nativity be included in the 2004 Town decorations. The Town Council denied Snowden's request to be permitted to display a Nativity

scene on public property, but it is unclear if her request was directed to the lampposts, Causeway Island, or both.

The issue was raised yet again, combined with a request by Snowden to also be allowed to add four Nativity scene banners on the lamp poles along Kane Concourse, at the September 13, 2004 Town Council meeting. She indicated she would put up and remove the displays, that all would comply with any applicable safety standards, and she would include disclaimers indicating they were her displays and not those of the Town. The Town Council indicated the matter would be placed on the agenda for the October meeting.

At the October 11, 2004 meeting, Snowden repeated her request, but none of the Council members presented a motion to have the matter voted on. She urged the members to vote on her request, and this was ultimately denied. The reason articulated by now-Mayor Salver, was that the Town did not want to violate the Establishment Clause by allowing the Plaintiff to erect her private display on public property. Tindle also maintains that Snowden was the only one advocating for the Nativity scene displays and that there was no public support in her favor. (Defendants' Verified Memorandum in Opposition, p. 4).

Most recently, on Friday, December 10, 2004, Plaintiff observed someone dressed in "Orthodox Jewish attire" (Plaintiff's Notice of Newly Discovered Evidence, Ex. 1, p. 2) park his car on the shoulder of Causeway Island, approach the menorah, apparently say a prayer, and manipulate the panel on the shaft of the menorah where the light switches that control the candles or bulbs of the menorah are located. There are nine light switches on the control panel of the menorah. When the

---

**3.** Defendants have not opposed these statements and actions attributed to Salver by the

Plaintiff and reported in the local newspaper.

timer that controls the lights for the displays on Causeway Island turned on later that evening, the menorah had four candles illuminated, along with the central candle, one more than had appeared lit the day before. Snowden's "newly discovered evidence"[4] also includes a photocopy of a weekly bulletin of the Shul, announcing Candle Lighting to occur at various locations, including "Bay Harbor Islands by the Toll Plaza." (*Id.*).

The Town has strenuously objected that any inference be drawn from Snowden's assumption that the person whom she saw "manipulating" the menorah was a rabbi associated with the Shul, without more. Moreover, in response to Snowden's assertions, the Town immediately issued a "cease and desist" letter to the Shul, and demanded that the Shul remove the statement contained in its bulletin concerning the forthcoming lighting ceremony. The Town insists only it has ever controlled the menorah on Causeway Island, and that the menorah, like the Christmas tree, lights via an automatic timer. What the Town does not address is who or what mechanism (if not a person associated with the Shul as Snowden believes) controls the individual light switches so that the candles illuminate in keeping with each night of Chanukah.

Causeway Island currently has on display a lighted 14–foot Christmas tree, a partially-lit nine-foot[5] menorah, and decorative sailboats. This suit and the request

for preliminary injunctive relief have followed.

## II. *ANALYSIS*

■ The four requirements for a temporary restraining order or preliminary injunction under Rule 65, Fed.R.Civ.P., are well established. The movant must demonstrate all four of the following:

(a) there is a substantial likelihood of success on the merits;

(b) the TRO or preliminary injunction is necessary to prevent irreparable injury;

(c) the threatened injury outweighs the harm that the TRO or preliminary injunction would cause to the non-movant; and

(d) the TRO or preliminary injunction would not be averse to the public interest.

*Parker v. State Board of Pardons and Paroles,* 275 F.3d 1032, 1035 (11th Cir.2001)(citing *Zardui–Quintana v. Richard,* 768 F.2d 1213, 1216 (11th Cir.1985)). A claim for injunctive relief may, of course, become moot if there is no reasonable expectation that the alleged violation will recur and interim events have completely eradicated the effects of the alleged violation. *Siegel v. LePore,* 234 F.3d 1163, 1172–73 (11th Cir.2000)(citing *Reich v. Occupational Safety & Health Review Comm'n,* 102 F.3d 1200, 1201 (11th Cir. 1997)). This opinion concerns itself primarily with the first element for injunctive

**4.** The Court is concerned that Snowden's Notice of Newly Discovered Evidence was timely communicated to the Court by e-filing on Saturday, December 11, 2004, but was not similarly provided to Defendants. Plaintiff only faxed the Notice to Defendants after 5:00 p.m. on Monday, December 13, 2004, a few minutes before Defendants received the Court's order requesting their response by 3:00 p.m. on the following day, Tuesday. Plaintiff has not yet responded to Defendants' objections to these delayed communications,

but a written explanation from Plaintiff's counsel is expected.

**5.** It is unclear how the original 14–foot menorah donated by the Shul now appears as a nine-foot menorah. (Bay Harbor's Verified Memorandum in Opposition, p. 3). Although Plaintiff indicates both structures are of equal height, the undersigned has personally observed the lighted displays and the tree is markedly taller than the menorah.

relief, namely, Plaintiff's likelihood of succeeding on the merits of her claims. As Plaintiff correctly argues, if she is successful in establishing this first element, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Cate v. Oldham,* 707 F.2d 1176, 1188–89 (11th Cir. 1983). The third and fourth elements for injunctive relief are not addressed by Defendants, and therefore are assumed to be conceded as well.

### A. Likelihood of success on the merits of the first claim for relief based on a violation of Plaintiff's free speech rights under the First Amendment

■ The First Amendment provides in pertinent part that "Congress shall make no law … abridging the freedom of speech." U.S. Const. amend. 1. Snowden's First Amendment right of freedom of speech is protected from infringement by state actors, such as the Town, by the Fourteenth Amendment. *See Everson v. Board of Educ.,* 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947). The likelihood of success of Snowden's claim of a free speech violation is examined in three steps. First, the undersigned must determine whether the speech in question—the requested placement of banners on light poles along Kane Concourse and the display of an unattended Nativity on Causeway Island-is protected speech. Second, the undersigned must determine what is the relevant forum as to each locale—the lampposts and grassy median—in order to analyze the extent to which the Town may limit access to each forum. Third, the Court must determine whether the reasons offered by the Town in limiting Snowden's access to each comport with constitutional standards. *See, e.g., Parkland Republican Club v. City of Parkland,* 268 F.Supp.2d

1349, 1353 (S.D.Fla.2003)(summarizing three-step analysis); *Summum v. City of Ogden,* 297 F.3d 995, 1000 (10th Cir.2002)(listing steps in the analysis).

### Protected Speech

■ The first question is easily answered as to both the presumably lighted Nativity scene banners and the proposed unattended Nativity scene, containing visual images of the birth of Jesus Christ, worshiped as the Son of God by all Christians. "[T]here is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Board of Ed. of Westside Community Schools (Dist. 66) v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990)(emphasis in original). Supreme Court "precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression." *Capitol Square Review and Advisory Board v. Pinette,* 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (citations omitted). The Eleventh Circuit, of course, has recognized and accorded such expression—beyond the mere spoken or written word—First Amendment protection:

Religious speech enjoys sanctuary within the First Amendment. *See Widmar v. Vincent,* 454 U.S. 263, 269, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981)("[R]eligious worship and discussion … are forms of speech and association protected by the First Amendment."). The Supreme Court has "long recognized that [the First Amendment's] protection does not end at the spoken or written word." *Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989). Our sister circuits have recognized as a

matter of course that displaying a religious symbol is protected speech under the First Amendment. *See, e.g., Kreisner v. City of San Diego,* 988 F.2d 883, 891 (9th Cir.1993); *Americans United for Separation of Church and State v. City of Grand Rapids,* 980 F.2d 1538, 1542 (6th Cir.1992)(*en banc*); *Doe v. Small,* 964 F.2d 611, 618–19 (7th Cir. 1992)(*en banc*); *cf. Johnson,* 491 U.S. at 406, 109 S.Ct. at 2540 (burning American flag is protected speech under the First Amendment); *Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 505–06, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969)(wearing a black armband is protected speech). We agree.

*Chabad–Lubavitch of Georgia v. Miller,* 5 F.3d 1383, 1387 (11th Cir.1993). Therefore, Snowden's requested public displays would constitute religious speech protected by the First Amendment.

### *Forum Analysis*

 Constitutionally protected religious expression, however, is not guaranteed unlimited access to government property. *Grossbaum v. Indianapolis–Marion County Building Authority,* 63 F.3d 581, 586 (7th Cir.1995). "The right to use government property for one's private expression depends upon" the nature of that property. *Pinette,* 515 U.S. at 761, 115 S.Ct. 2440. Therefore, courts are required to move to the second inquiry, which is the Supreme Court's forum analysis for "determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *Sentinel Communications Co. v. Watts,* 936 F.2d 1189, 1201 (11th Cir. 1991). In other words, " 'the extent to which the Government can control access

depends on the nature of the relevant forum.' " *United States v. Kokinda,* 497 U.S. 720, 726, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990)(quoting *Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439). Properly identifying the relevant forum requires an approach that considers the government property at issue as well as the type of access sought. *Cornelius,* 473 U.S. at 801, 105 S.Ct. 3439; *Summum,* 297 F.3d at 1001.

Here, there are two fora under consideration. *See, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)(applicable forum was the mailboxes of the teachers and the interschool mail system). The first consists of the lampposts along Kane Concourse, and the second is Causeway Island. The access sought in the former is the placement of banners or lighted displays similar in form but not in content to those currently on display by the Town. The access sought in the latter is the placement of a temporary, unattended Nativity or creche, with clear notice that it is Snowden's, and not the Town's display.

 Once the fora are identified, they must be classified. In conducting the forum analysis, a "now-familiar tripartite conceptual framework," *Sentinel Comm.,* 936 F.2d at 1201, first announced in *Perry Educ. Ass'n,* 460 U.S. at 44–45, 103 S.Ct. 948, should be utilized to determine how First Amendment interests are analyzed with respect to different forms of government property. That tripartite framework has at one end of the continuum what has been labeled as the " 'traditional' or 'quintessential' public fora. These are places that 'by long tradition or by government fiat have been devoted to assembly and debate,' and the classic examples of such fora are public streets and parks." *Sentinel,* 936 F.2d at 1201.

Speech finds its greatest protection in traditional public fora, and government may not alter their public status without completely changing the fora's use, *e.g.*, converting a public park to an office building. In public fora, content-neutral time, place, and manner regulations of speech must be narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication.

*Make the Road by Walking, Inc. v. Turner,* 378 F.3d 133, 142 (2d Cir.2004) (citations omitted). Therefore, content-based restrictions in public fora are only upheld if "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end." *Id.* (quoting *Perry,* 460 U.S. at 45, 103 S.Ct. 948).

■■■ The second category of government property is known as the "designated" or "limited" [6] public forum, and

"may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449 (citing *Perry,* 460 U.S. at 45, 46 n. 7, 103 S.Ct. at 954, 955 n. 7); *see, e.g. Widmar v. Vincent,* 454 U.S. 263, 267, 102 S.Ct. 269, 273, 70 L.Ed.2d 440 (1981)(state university meeting facilities); *Madison Joint School Dist. v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167, 174 n. 6, 97 S.Ct. 421 n. 6, 50 L.Ed.2d 376 (1976)(school board meetings); *Southeastern Promotions Ltd. v. Conrad,* 420 U.S. 546, 555, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975)(municipal auditorium and city-

leased theater). A public forum created by government designation thus consists of public property that the State has opened for expressive activity. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449. Accordingly, the touchstone for determining whether property is a designated public forum is government intent in establishing and maintaining the property. *Stewart v. District of Columbia Armory Bd.,* 863 F.2d 1013, 1016 (D.C.Cir.1988)(citing *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449).

*Sentinel,* 936 F.2d at 1202.

■■■ The courts also examine "the nature of the property and its compatibility with expressive activity to discern the government's intent." *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. The government may elect to close a designated public forum, *Perry,* 460 U.S. at 46, 103 S.Ct. 948, but as long as it remains open, government's regulation of speech within it is "subject to the same limitations as that governing a traditional public forum." *International Society for Krishna Consciousness, Inc. v. Lee (Lee I),* 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). Therefore, "the state cannot constitutionally penalize private speakers by restricting either their right to speak or the content of their speech simply because the state exhibited dubious wisdom in creating, or has been slovenly in its mainte-

---

**6.** *Cf. Searcey v. Crim,* 815 F.2d 1389, 1391 n. 4 (11th Cir.1987)("the 'limited' public forum terminology is misleading because '[a]lthough the government, when it turns property from a nonpublic forum into a public one, may do so only for a limited purpose, ... it also may open the forum to the same extent as a tradi-

tional forum.' Accordingly, this second category of property is best described in terms of 'designated' or 'created' public forums.")(quoting *M.N.C. of Hinesville, Inc. v. United States Dep't. of Defense,* 791 F.2d 1466, 1472 n. 2 (11th Cir.1986)).

nance" of a designated public forum. *Chabad–Lubavitch of Georgia,* 5 F.3d at 1394.

It appears that more recently, the Supreme Court receded from the strict scrutiny standard announced in *Lee I* as to the designated public forum when it held that "[t]he necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics." *Rosenberger v. Rector and Visitors of the Univ. of Va.,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)(citing *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439, and *Perry,* 460 U.S. at 49, 103 S.Ct. 948). Thus, as recognized in *Parkland Republican Club,* 268 F.Supp.2d at 1354:

> [W]hen the government opens a limited public forum it must "respect the lawful boundaries it has itself set. *The State may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum'* ... *nor may it discriminate against speech on the basis of its viewpoint....*" ... As a result, the Supreme Court has drawn "a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations."

(emphasis in original)(internal quotations and citations omitted).

▇▇▇▇ The third and last forum is the nonpublic one which government "may reserve ... for its intended purposes," *Perry,* 460 U.S. at 46, 103 S.Ct. 948, and over which it has the right to exercise control regarding access. *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439. "[R]estrictions on speech in nonpublic fora are valid if they are 'reasonable' *and* 'not an effort to suppress expression merely because

public officials oppose the speaker's view." *Lee I,* 505 U.S. at 687, 112 S.Ct. 2701 (O'Connor, J., concurring)(emphasis added). Restrictions on speech in nonpublic fora are reasonable when " 'consistent with the [government's] legitimate interest in 'preserv[ing] the property ... for the use to which it is lawfully dedicated.' " *Id.* (quoting *Perry,* 460 U.S. at 50–51, 103 S.Ct. 948, quoting *Postal Service v. Council of Greenburgh Civic Assns.,* 453 U.S. 114, 129–130, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981)). Viewpoint neutrality demands that the state not suppress speech if the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses. *Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510; *Ridley v. Massachusetts Bay Transp. Auth.,* 390 F.3d 65, 2004 WL 2698433 * 13 (1st Cir.2004).

Applying the forum analysis framework to the facts presented yields different results for the two locales at issue, as they presently exist. First, as to the lampposts along Kane Concourse, these quite clearly comprise a nonpublic forum. At no time in the Town's history, according to the limited factual submissions, have the lampposts or their accompanying lighted displays been open as a means of public communication. The objected-to earlier displays consisting of Stars of David, menorahs and poinsettias, now replaced by equal numbers of Christmas trees, snow flakes and menorahs, appear to have always been under the control of the Town and to have been decorative displays by the Town.

The discussion in *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 814, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) is instructive in this regard. The Court found no "traditional right of access respecting such items as utility poles for purposes of ... [Appellees'] communication compara-

ble to that recognized for public streets and parks, and ... [that it was] clear that 'the First Amendment does not guarantee access to government property simply because it is owned or controlled by the government.'" *Id.* (quoting *Greenburgh Civic Assns.,* 453 U.S. at 129, 101 S.Ct. 2676). The *Vincent* Court went on to observe that "[l]ampposts can of course be used as signposts, but the mere fact that government property can be used as a vehicle for communication does not mean that the Constitution requires such uses to be permitted." *Id.* Similar to the inadequate showing made by the plaintiff in *Lubavitch Chabad House, Inc. v. City of Chicago,* 917 F.2d 341, 347 (7th Cir.1990), Plaintiff here has not shown that anyone other than the Town or the State, which control the light poles,[7] ever erected any banners or holiday displays on the lampposts, despite her assertion that the light poles "have been opened for use by the public for the purpose of pole displays." (Plaintiff's Motion, p. 9 n. 5). Thus the light poles and accompanying banners are properly considered a non-public forum.

The second locale under consideration, Causeway Island, is also not a public forum, despite Snowden's characterization of it as such. It is not a traditional park or area where people congregate, gather, and traditionally have a free exchange of ideas and speakers, with appropriate accommodations facilitating such use, such as public restrooms and public parking. This grassy area is more appropriately what Defendants have represented it to be, a rather small green space abutting two roadways, with no buffers such as sidewalks for protection or apparent invitation to the public. It does not present the physical character-

istics of a park beyond the presence of grass, and is not associated with or near a seat of legislative or executive power. *Cf. Warren v. Fairfax County,* 196 F.3d 186 (4th Cir.1999). Although technically open to the public, it does not function as a traditional or "quintessential" public forum. *See, e.g., Kokinda,* 497 U.S., at 728–29, 110 S.Ct. 3115 ("[T]he dissent is simply incorrect in asserting that every public sidewalk is a public forum. *Post,* at 3129–3130. As we recognized in *Grace* [*United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)], the location and purpose of a publicly owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum.").

In 2001, Causeway Island appears to have been intended by the Town to become a designated public forum when the Town Council deliberately chose to open it for "speech" by the Shul as a result of its approval of the placement of the lighted menorah. The Town, by the vote of its Council members following a public meeting, approved what can best be described as a designated public forum dedicated to a temporary, unattended holiday display. It certainly did for the Shul and those "several residents" who had asked the Town to permit the Shul to do so.

The issue thus presented is whether it continues to be a designated public forum. One view would be that after the initial approval given to the Rabbi, the Town took no further affirmative steps to retain that "open character" regarding expressive activity. Certainly the Shul never returned to request permission to continue to display a menorah. The displays in the ensuing years were made by the Town,

---

**7.** According to Plaintiff, the Florida Department of Transportation allows the placement of banners on light poles along any state road within a municipality so long as the citizen receives permission from the local government. *See* Fla. Admin. Code. R. 14–

43.001(1), (4). Kane Concourse, or State Road 922, is a State road. It is unclear from the record if the Town obtained or needed permission from the State prior to its placement of the lighted displays.

and were modified to their present form by the Town, with input by staff, not by a private speaker. No other private displays were placed on Causeway Island. Thus, one could argue that Causeway Island reverted back to what it appears to have functioned as all along, a non-public forum.

The opposing view, that expressed convincingly by Snowden, is that the Town reaffirmed its designation of Causeway Island as a designated public forum in the ensuing years when it continued to display the Shul's menorah. Indeed, the recent activities observed by Snowden on December 10 create an inference that the menorah has not been [8] a display exclusively controlled by the Town. A strong showing has been made that the menorah continued to be associated with the Shul, which in 2001 obtained Town approval to have the display erected and a power source supplied every holiday season, although the discussion in the minutes does not reflect that the display would be repeated every year thereafter. In any event, whether currently a non-public forum or a designated public forum, the standard of review is the same and will require that government action not exclude speech where it is not reasonable in light of the purpose served by the forum and where it discriminates against speech on the basis of viewpoint.

### Application of the Appropriate Levels of Forum Analyses

■ Snowden's claim of a violation of her free speech associated with the Town's denials of her requests to place Nativity scene lighted banners along Kane Concourse does not show a substantial likelihood of succeeding on its merits. The light poles along Kane Concourse are a non public forum and have always been such. The Town has not granted any other person or entity permission or approval to erect a lighted display on the State's light posts,[9] in contrast to the control exercised and right given when the Shul's request as to Causeway Island was approved. The Town's decisions to restrict access regarding the selection of banners to be placed on the light poles need only be reasonable; they need not be the most reasonable or the only reasonable limitation. Here, the Town has at all times controlled the content of the lighted banners placed on its light poles, and has never taken any steps to expand the reach of the forum to access by private citizens.

Moreover, while the facts support a very strong inference that Salver opposed Snowden's views regarding the under-inclusiveness of the light pole displays, his personal views and any personal actions taken against Snowden cannot be imputed to the Town Council as a whole, without more, such as a similar request granted to someone espousing different views. Indeed, Mayor Zilber expressly told Snowden she disagreed with Salver's written response to the initial inquiry made by Snowden, and agreed the Town's lighted displays needed to be more representative. The later appearances by Snowden before the Council appear to have focused more on the requested creche on Causeway Island rather than the banners on Kane Concourse.

The Town urges a finding that there is no viewpoint-based animus involved as to both locales, given that the Council merely approved a recommendation made by staff following Town workshops. When the is-

8. By its cease and desist letter, the Town has presently indicated to the Shul that the Shul cannot access or manipulate the lighted menorah.

9. It is also unclear how injunctive relief addressed to the Town would give Plaintiff the ability to erect lighted displays on the light posts, given that it appears the State would be an indispensable party to such a remedy.

sue was first presented to the Town Council by Snowden in December of 2003, the Council's immediate response was not to invite study and recommendation, but rather to attempt to evade the issue. Indeed, the Council meeting in question was adjourned abruptly after Snowden was told it was too late in the year to consider the matter. Admittedly, the later action taken by the Town Council was to seek a recommendation by staff, which the record shows it then unanimously approved. That recommendation also curiously included a request that it should be the Town that controls the decorations. In light of the totality of the circumstances presented, the undersigned places little weight to the staff report or Town workshops as an indicator that there was or was not a desire by the Town Council to stifle a particular viewpoint.

▆▆▆ As to Causeway Island, Plaintiff's likelihood of success on the merits of her free speech claim appears far greater. For four years the Town has been displaying the Shul's menorah, at the request of the Shul, Shul-member Salver, and certain Town residents who urged that the Town permit its display. The display of the menorah by the Shul was unquestionably protected First Amendment religious speech.[10] Although the Town would have it appear that the menorah simply became a holiday decoration owned by the Town upon its "donation," the latest actions observed would indicate that at least the Shul believed it continued to be associated with its yearly display, and could plan for and announce a lighting ceremony in its bulletin to take place on Causeway Island.

In contrast, Plaintiff's seemingly similar requests to be permitted to erect a Nativity or creche were met with hostility, for apparently no other reason than the view expressed in her proposed speech. Her initial request in December of 2003 was met with the response that it was too late in the year to be considered. It was then followed by an abrupt cessation of the meeting, with all but one interested Council member leaving the room. Her alternative suggestion in December 2003 of a living Nativity, which also preceded any invitation for a staff recommendation, was met with demands that she agree not to repeat her request for a free-standing Nativity, and that she not bring legal action against the Town. And, according to Snowden, Defendant Salver, a public official and member of the Shul, only added fuel to an already incendiary situation by seeking to have her evicted from her apartment.

One could argue that Snowden's requests in 2003 and 2004 are different from the one presented by the Shul in 2001 because no Council member was sponsoring her or because she did not have support from other members of the community. First Amendment protections, however, are not dependent upon the popularity of the speaker or the views or position taken, nor do they only serve to protect the interests of those in the majority.

The Council did finally articulate seemingly legitimate concerns supporting its denial of Snowden's repeated requests. Ordinarily, the official reasons given for state action should be given great weight. The reasons may, however, function as a cover for viewpoint-based restrictions which are impermissible. Here, the explanations given for a denial of Snowden's requests concerned themselves with the Town's perception that to accede would violate the Establishment Clause, a reason recognized as a compelling interest *if* sup-

**10.** Menorahs have a secular as well as a religious dimension. *County of Allegheny v. American Civil Liberties Union Greater Pitts-* *burgh Chapter,* 492 U.S. 573, 586 n. 34, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989).

ported by the surrounding facts. *See, e.g., Pinette*, 515 U.S. at 761–62, 115 S.Ct. 2440; *cf. Chabad–Lubavitch of Georgia*, 5 F.3d at 1395 ("[i]n a true public forum ... the Establishment Clause cannot be used as a justification for content-based restrictions on religious speech."). Here, that reason may be genuine as it also surfaced in the discussion when the Council was entertaining whether the Rabbi's request would violate the Establishment Clause, and the Council was reassured that it would not on the basis of Supreme Court jurisprudence. But having once been reassured that the Rabbi's request did not violate the Establishment Clause, the Council's dilatory and evasive actions taken towards Snowden's request, combined with the request that staff intervene and present a recommendation, cast doubt about the genuineness of the later stated Establishment Clause rejection.

The actions taken by the Town for this 2004 holiday season certainly address the earlier absence of a balanced and inclusive display by now including, for the first time, a Christmas tree alongside the menorah. This current, more inclusive display is without question a result of Snowden's continuous objections to the former displays in the Town and the Town workshops. The result achieved does not completely eradicate the effects of the alleged free speech violation, however. To allow it to do so would be to permit the Town to effectively "silence" Snowden's private views by taking over the contents and manner of a display it had formerly approved for another private speaker, regarding the same content—holiday displays—but different viewpoint.

When examined under strict scrutiny (*Perry*, 460 U.S. at 46, 103 S.Ct. 948), no compelling reason is given for the continued denials to Plaintiff's requests. Examined under reasonableness plus a lack of discriminatory intent (*Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510), the manner in which Snowden's requests were denied was not reasonable when contrasted with the earlier approval given the Shul, and she has presented evidence supporting a strong inference that her requests were denied precisely because of the viewpoint expressed in her proposed display. Snowden has presented strong evidence showing that the Town Mayor, who did not abstain from voting or participating in the meetings and deliberative processes in question, exhibited personal hostility to her and her viewpoints. Accordingly, the undersigned finds that Snowden has met her burden of showing a substantial likelihood of prevailing on the merits of her free speech claim as it pertains to the Town's denials of her requests to be permitted to place a private creche alongside the existing holiday decorations on Causeway Island.[11]

## B. *Likelihood of success on the merits of the second claim for relief based on a violation of the Establishment Clause*

In her second claim for relief, Snowden alleges that Defendants have violated the Establishment Clause by promoting and endorsing Judaism and showing hostility toward Christianity. The Court analyzes the two time periods and two displays at issue: (1) the Stars of David, menorahs, and poinsettias displayed on Kane Concourse from 2001–2003; (2) the menorahs, snowflakes, and Christmas trees presently displayed on Kane Concourse; (3) the menorah on Causeway Island from 2001–2003; and (4)

---

11. A far weaker showing is made, however, as to Tindle, whose primary involvement occurred in acting as the messenger of the Town's "settlement offer" to Snowden, and in later overseeing the staff study and recommendation.

the Christmas tree and the menorah presently displayed on Causeway Island.

■■■ The Establishment Clause prohibits Congress from making any law "respecting the establishment of religion, or prohibiting the free exercise thereof. . . ." U.S. Const., Amend. I. The prohibition against the establishment of religion applies to the states through the Fourteenth Amendment. *King v. Richmond County, Georgia*, 331 F.3d 1271, 1275 (11th Cir. 2003). A governmental practice violates the Establishment Clause if: (1) it does not have a secular purpose; (2) its primary effect is to advance or inhibit religion; or (3) it fosters excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Lynch v. Donnelly*, 465 U.S. 668, 679, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984).[12] State action violates the Establishment Clause if it fails to satisfy any of these prongs. *Edwards v. Aguillard*, 482 U.S. 578, 583, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).

### Secular Purpose

■■■ "Under the *Lemon* analysis, a statute or practice which touches upon religion, if it is to be permissible under the Establishment Clause, must have a secular purpose." *King*, 331 F.3d at 1276 (quoting *County of Allegheny*, 492 U.S. 573, 592, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)). "This does not mean that the law's purpose must be unrelated to religion—that would amount to a requirement that the government show a callous indifference to religious groups, and the Establishment Clause has never been so interpreted. Rather, Lemon's 'purpose' requirement

aims at preventing the relevant government decision maker . . . from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." *Benning v. Georgia*, 391 F.3d 1299, 1309 (11th Cir.2004). A religious purpose alone is not enough to invalidate a governmental act, but the secular purpose must predominate. *See Wallace v. Jaffree*, 472 U.S. 38, 56, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); *Lynch*, 465 U.S. at 681, n. 6, 104 S.Ct. 1355.

■■■ In order to determine whether a secular purpose exists, courts analyze the government's stated intent for the disputed law or practice. *King*, 331 F.3d at 1276. If there is no evidence of the government's intent for the practice, then the government may propose a possible secular purpose later. *Id.* The Supreme Court has generally reviewed the government's stated purpose in Establishment Clause cases and grants these statements a great deal of deference. *See, e.g., Committee for Public Education v. Nyquist*, 413 U.S. 756, 773, 93 S.Ct. 2955, 37 L.Ed.2d 948, (1973) ("we need touch only briefly on the requirement of a 'secular legislative purpose.' As the recitation of legislative purposes appended to New York's law indicates, each measure is adequately supported by legitimate, nonsectarian state interests"); *Lemon*, 403 U.S. at 613, 91 S.Ct. 2105 ("the statutes themselves clearly state they are intended to enhance the quality of the secular education"); *Sloan v. Lemon*, 413 U.S. 825, 829–830, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973).

---

12. Even though some Justices and commentators have strongly criticized *Lemon*, both the Supreme Court and the Eleventh Circuit continue to use *Lemon's* three-pronged analysis. *King*, 331 F.3d at 1276; *Adler v. Duval County Sch. Bd.*, 206 F.3d 1070, 1075 (11th Cir.2000)

(en banc), *vacated by* 531 U.S. 801, 121 S.Ct. 31, 148 L.Ed.2d 3, *opinion and judgment reinstated by* 250 F.3d 1330 (11th Cir.2001); *ACLU v. Rabun County*, 698 F.2d 1098 (11th Cir.1983).

Looking first at the decorations on Kane Concourse, the Town did not articulate a reason for the placement of the menorahs, Stars of David, and poinsettias. Very little is known as to the origins of that display. Nonetheless, with the brief Town history summarized above, and given the content of the display, the undersigned concludes that the intent was primarily to celebrate Chanukah and the winter season. The religious purpose thus predominates over any secular purpose in the decorations. The Court concludes that the Town has a secular purpose, however, for the current decorations of the 2004 holiday season.

■■■ As to the display on Causeway Island from 2001 through 2003, the Court concludes that the Town did not have a secular purpose for the display of the menorah. A celebration of the holiday season may be a valid secular purpose. *See County of Allegheny,* 492 U.S. at 616, 109 S.Ct. 3086. Nevertheless, in the present case, the evidence supports a finding that the Town's intent was to allow the Shul to express a celebration of Chanukah as a religious holiday. According to the minutes of the Town Council meeting in 2001, the Town allowed the placement of the menorah on Causeway Island for the benefit of the Shul, a religious organization, and the members of the Shul and other residents who supported the request. Although at the meeting there was some discussion as to whether the menorah is a religious or secular symbol, there is no evidence that the Town chose the menorah as a secular symbol.

In general, a menorah is a religious symbol, although it may have connotations other than religious depending on the context of its placement. *County of Allegheny,* 492 U.S. at 613–14, 109 S.Ct. 3086 ("The menorah, one must recognize, is a religious symbol: it serves to commemorate the miracle of the oil as described in the Talmud. But the menorah's message

is not exclusively religious. The menorah is the primary visual symbol for a holiday that, like Christmas, has both religious and secular dimensions."). Because the menorah on Causeway Island stood alone, the Court concludes that the religious purpose was predominant. The Town has not articulated a secular purpose for the placement of the menorah on Causeway Island, nor can the Court infer one.

■■■ Now that the Town has modified its holiday decorations on Causeway Island, the Court finds that the Town has demonstrated a secular purpose for the display, namely, a celebration of the holiday season in December. The menorah and the Christmas tree, placed near each other, evidence a secular purpose that was absent from the original placement of only the menorah in 2001–2003. The Town Council in March 2004 agreed that the Town would display inclusive decorations from the various holidays celebrated in the month of December, and the current display follows that mandate of the Town Council.

### Primary Effect

■■■ Turning to the second prong, the Court notes that in cases following *Lemon,* the Supreme Court has "paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion . . . ." *County of Allegheny,* 492 U.S. at 592, 109 S.Ct. 3086. "The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *Id.* (quoting *Lynch,* 465 U.S. at 687, 104 S.Ct. 1355 (O'Connor, J., concurring)). To determine whether a government's use of an object with religious significance constitutes an endorsement of religion, a court

must consider the context in which the contested object appears, using perceptions of the reasonable observer who is presumed to be aware of the history of the context in which the religious display may be found as a guide. *County of Allegheny*, 492 U.S. at 595, 109 S.Ct. 3086. "[T]he 'history and ubiquity' of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion." *Id.* at 630, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in the judgment).

In *Allegheny*, the Court reviewed two holiday displays. The first was a Nativity scene that sat "on the Grand Staircase, the 'main' and 'most beautiful part' of the building that is the seat of county government." *County of Allegheny*, 492 U.S. at 579, 109 S.Ct. 3086. The Court found that with this display, which included the statement, in Latin, "Glory to God in the highest," the County was sending the message that it supported and promoted the Christian praise to God that is the Nativity scene's religious message. *Id.* at 602, 109 S.Ct. 3086. On the other hand, the Court did not find a violation of the other display, which included a Christmas tree and a menorah placed together.

In evaluating the second display, the Christmas tree and menorah, the central inquiry of the *Allegheny* Court was whether that combined display had the effect of endorsing both Christian and Jewish faiths, or whether it recognized that Christmas and Chanukah are part of the same winter-holiday season, which has attained a secular status in our society. *County of Allegheny*, 492 U.S. at 616, 109 S.Ct. 3086. The Christmas tree was the predominant element in the city's display. *Id.* However, although the Court concluded that the menorah's presence in the second display was constitutional, the

Court did not agree on the reason. What has emerged from subsequent decisions is that courts "must evaluate challenged governmental practices on a case-by-case basis, judging each practice in its unique circumstances and in its particular physical setting." *King*, 331 F.3d at 1282.

■■■■ Turning to the displays at issue, as to the Kane Causeway lampposts, the earlier displays, seen in context along with the Causeway Island menorah, show evidence of the Town's endorsement of religion. The present displays are clearly more in line with the *Allegheny* decision.

■■ The Court also finds that the reasonable observer of the menorah on Causeway Island from 2001–2003 would find that the menorah is a religious symbol and that the sailboats are secular, unrelated to any holiday celebration. The menorah, standing alone, was thus an endorsement of the religion associated with it, and was the only symbol associated with a religious holiday found on Causeway Island. Like the Nativity display in *Allegheny*, the display included only a religious symbol, with no other symbols. "Of course, giving sectarian religious speech preferential access to a forum close to the seat of government (or anywhere else for that matter) would violate the Establishment Clause ...." *Pinette*, 515 U.S. at 776, 115 S.Ct. 2440. That is exactly what the Town had done by allowing the menorah to be displayed on Causeway Island since 2001 but not displaying any other holiday decorations in the 2003 season although it was given the opportunity to do so by Plaintiff.

■■ Today, however, the reasonable observer on Causeway Island would come to a different conclusion. The reasonable observer would see a large Christmas tree and a smaller menorah side by side, and, like the reasonable observer in *Allegheny*,

would find a secular purpose to the display, namely, a celebration of the December holidays.

### Excessive Entanglement with Religion

■■■ Finding that the Town's former displays fail two prongs of the *Lemon* test, the Court need not consider the final prong. However, the Court notes that in *Allegheny,* the menorah was owned by a religious organization, but was stored, erected, and removed each year by the city. *County of Allegheny,* 492 U.S. at 586, 109 S.Ct. 3086. The Court did not find that the city was excessively entangled with religion, regardless of the ownership. Similarly, in this case, the Town argues that the menorah was donated by the Shul, but that the Town has owned and controlled the menorah since its donation.

The most recent evidence submitted by Snowden and the Town as to the events of the last few days indicate that a religious organization still exercised "control" over the menorah. As *Allegheny* suggests, ownership is not dispositive of the entanglement prong. However, while the Shul's previous ownership is not dispositive, the recent observations show a continued association between the Town and the religious organization, which the Town unquestionably has now sought to sever.

■■■ The Court concludes that Snowden has demonstrated a likelihood of success on the merits with respect to her Establishment Clause claim for previous violations. Although Snowden has demonstrated a likelihood of success on the merits with respect to previous violations of the Establishment Clause, the Court cannot award injunctive relief on that claim because the Town has remedied the violations. *See Meltzer v. Board of Pub. Instruction of Orange County,* 548 F.2d 559, 562–568 (5th Cir.1977) (refusing to reverse district court's denial of injunctive relief even though school district had proved

very reluctant to comply with constitutional requirements of Establishment Clause), *aff'd on rehearing,* 577 F.2d 311 (1978). The Court cannot require the Town to allow Snowden's display simply because the Town may have violated the Establishment Clause in the past, before she made her requests. Moreover, Snowden does not have a likelihood of success on the merits with respect to Kanc Concourse or Causeway Island's current decorations, notwithstanding her stronger showing as to a violation of her free speech rights.

### C. Likelihood of success as to the third claim for relief based on an equal protection violation

■■■ In her third claim for relief, Snowden alleges that Defendants violated her right to equal protection by denying her access to a public forum for religious expression based on the content and viewpoint of her religious expression. According to Snowden, Defendants impermissibly allowed the Shul access to Causeway Island for the purpose of expressing a religious viewpoint, while denying her the same opportunity.

■■■ The Equal Protection Clause commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amend. XIV, Sec. 1. "The Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans,* 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (citations omitted). If a law neither burdens a fundamental right nor targets a suspect class, the Court will uphold the legislative classification so long as it bears a rational relation to some legitimate end. *Id.* However,

if a law burdens a fundamental right, then the Court must apply strict scrutiny to the law. *Clark v. Jeter,* 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988).

Snowden argues that her fundamental rights to free speech and religious expression have been suppressed by the Town, which has favored Jewish expression over Christian expression. According to Snowden, the Town has allowed the Shul to express a religious message on Causeway Island from 2001 to the present, while it has denied her the same opportunity to express her religious message. In light of the undersigned's conclusions as to the likelihood of success of Plaintiff's free speech claim, it may be that Snowden has similarly shown a likelihood of succeeding on her equal protection claim as well, only as it pertains to Causeway Island. *See, e.g., Carey v. Brown,* 447 U.S. 455, 461–62, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980)(statute prohibiting picketing in residences or dwellings, but exempting peaceful picketing of a place of employment involved in a labor dispute, denied equal protection); *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Board,* 276 F.3d 876, 879 n. 1 (6th Cir.2002)("ordinance also implicates the Equal Protection Clause by employing a classification that affects 'a constitutionally protected fundamental right, the right to freedom of speech' ")(quoting *Lac Vieux Desert Band v. Michigan Gaming Control Board,* 172 F.3d 397, 410 (6th Cir.1999)); *Jocham v. Tuscola County,* 239 F.Supp.2d 714 (E.D.Mich.2003)(plaintiffs' allegations that other, Christian citizens were permitted to speak for five minutes during public comment period during board of county commissioners' meeting, but that plaintiffs were not similarly allowed to express their views opposed to a creche erected on the front lawn of the county courthouse, and that the suppression was based on the religious or anti-religious content of their speech, stated claim for violation of the Equal Protection clause).

### III. *CONCLUSION*

In light of the foregoing, it is

**ORDERED AND ADJUDGED** that Plaintiff, Sandra Snowden's Motion for Temporary Restraining Order or, in the Alternative, Motion for Preliminary Injunction (D.E. 2) is **GRANTED** in part as it pertains to her request for a preliminary injunction requiring the Town to allow her to place a Nativity scene or creche on Causeway Island. The parties are to forthwith advise the Court in writing as to how this will be accomplished, given that the Town must act through duly noticed public meetings.